UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WORLD WRESTLING ENTERTAINMENT,
LLC, f/k/a WORLD WRESTLING
ENTERTAINMENT, INC.,

                    Plaintiff,

            v.

PANINI S.P.A.,

                  Defendant.

Case No. 23-CV- 8371 (LGS)

**MEMORANDUM OF LAW IN SUPPORT OF**
**WWE'S MOTION FOR A PRELIMINARY INJUNCTION AND**
**TEMPORARY RESTRAINING ORDER**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 6

FACTUAL BACKGROUND ................................................................................................... 8

I.      WWE ................................................................................................................... 8

II.     The WWE-Panini License Agreement .............................................................. 9

III.    WWE's Termination of the License Agreement Following Panini's Breach .................. 11

IV.    Panini's Unlawful Activities .............................................................................. 12

ARGUMENT ......................................................................................................................... 14

I.      WWE Is Likely to Succeed on the Merits of Its Claims .................................. 15

      A.     Panini Breached the Terms of the License Agreement ......................... 15

      B.     Panini Has Breached and Is Continuing to Breach the Termination
             Provisions of the License Agreement ................................................... 18

      C.     Panini's Conduct Infringes WWE's Trademarks ................................ 20

      D.     Panini's Unauthorized Use Dilutes the Value of WWE's Trademarks .............. 24

      E.     Panini's Conduct Infringes WWE's Copyrights .................................. 25

II.     WWE Will Suffer Irreparable Harm If Panini Is Not Immediately Restrained .............. 26

III.    The Balance of Hardships Weighs Strongly in WWE's Favor ........................ 28

IV.    The Public Interest Supports an Injunction ..................................................... 30

V.     TRO Is Needed to Preserve the Status Quo Pending a Preliminary Injunction
      Hearing ............................................................................................................. 30

CONCLUSION ...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Benihana, Inc.* v. *Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)........................................................................9

*C=Holdings B.V.* v. *Asiarim Corp.*,
    992 F. Supp. 2d 223 (S.D.N.Y. 2013)...........................................................16

*Cadbury Beverages, Inc.* v. *Cott Corp.*,
    73 F.3d 474 (2d Cir. 1999)........................................................................17

*Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)......................................................................15

*Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986)...........................................................22, 23, 25

*CJ Prods. LLC* v. *Snuggly Plushez LLC*,
    809 F. Supp. 2d 127 (E.D.N.Y. 2011) ..........................................................24

*Don King Productions, Inc.* v. *Douglas*,
    742 F. Supp. 741 (S.D.N.Y. 1990) ..............................................................13

*Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*,
    216 F. Supp. 2d 31 (E.D.N.Y. 2001) ...........................................................17

*Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004).......................................................................10

*Farberware Licensing Co. LLC* v. *Meyer Mktg. Co., Ltd.*,
    2009 WL 2710209 (S.D.N.Y. Aug. 25, 2009) ...............................................11

*Feist Publc'ns, Inc.* v. *Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)................................................................................20

*Flawless Style LLC* v. *Saadia Group LLC*,
    2023 WL 3687782 (S.D.N.Y. May 26, 2023) ...........................................15, 25

*Friesland Brands, B.V.* v. *Vietnam Nat. Milk Co.*,
    228 F. Supp. 2d 399 (S.D.N.Y. 2002)...........................................................19

*GTFM, Inc.* v. *Solid Clothing Inc.*,
    215 F. Supp. 2d 273 (S.D.N.Y. 2002)...........................................................18

2

*HLT Existing Franchise Holding LLC* v. *Worcester Hosp. Grp. LLC*,
 994 F. Supp. 2d 520 (S.D.N.Y. 2014)..................................................................11, 13

*Iancu* v. *Brunetti*,
 139 S. Ct. 2294 (2019)..................................................................................15

*JTH Tax, LLC* v. *Agnant*,
 62 F.4th 658 (2d Cir. 2023) ............................................................................3

*Kraft Gen. Foods, Inc.* v. *Allied Old English, Inc.*,
 831 F. Supp. 123 (S.D.N.Y. 1993) ....................................................................23

*Krevat* v. *Burgers to Go, Inc.*,
 2014 WL 4638844 (E.D.N.Y. Sep. 16, 2014)..........................................................19

*Krispy Kreme Doughnut Corp.* v. *Satellite Donuts, LLC*,
 725 F. Supp. 2d 389 (S.D.N.Y. 2010)..................................................................15

*L & L Wings, Inc.* v. *Marco-Destin, Inc.*,
 676 F. Supp. 2d 179 (S.D.N.Y. 2009)..................................................................16

*Lane Capital Mgmt., Inc.* v. *Lane Capital Mgmt., Inc.*,
 192 F.3d 337 (2d Cir. 1999).............................................................................15

*Louis Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*,
 799 F.2d 867 (2d Cir. 1986).............................................................................15

*Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*,
 454 F.3d 108 (2d Cir. 2006).............................................................................20

*Major Oldsmobile, Inc.* v. *Gen. Motors Corp.*,
 101 F.3d 684, 1996 WL 280452 (2d Cir. 1996) ......................................................11

*Make the Road New York* v. *Cuccinelli*,
 419 F. Supp. 3d 647 (S.D.N.Y. 2019)..................................................................24

*Markovits* v. *Venture Info. Capital, Inc.*,
 129 F. Supp. 2d 647 (S.D.N.Y. 2001)..................................................................25

*Metropolitan Life Ins. Co.* v. *RJR Nabisco Inc.*,
 716 F. Supp. 1504 (S.D.N.Y. 1989)....................................................................13

*Mint, Inc.* v. *Amad*,
 2011 WL 1792570 (S.D.N.Y. May 9, 2011) ..........................................................24

*Morningside Grp., Ltd.* v. *Morningside Cap. Grp., L.L.C.*,
 182 F.3d 113 (2d Cir. 1999).............................................................................18

3

*Murjani International, Ltd.* v. *Sun Apparel, Inc.*,
    1987 WL 15110 (S.D.N.Y. July 31, 1987) ................................................................23

*New York* v. *United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)........................................................................................24

*N.Y. State Soc'y of Cert. Pub. Accountants* v. *Eric Louis Assocs., Inc.*,
    79 F. Supp. 2d 331 (S.D.N.Y. 1999).........................................................................16

*N.Y.C. Triathlon* v. *NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................19, 23

*Oleg Cassini, Inc.* v. *Weber's 32nd St. Corp.*,
    2008 WL 2780988 (S.D.N.Y. July 15, 2008) ...........................................................20

*Optima Media Group Limited* v. *Bloomberg L.P.*,
    2021 WL 1941878 (S.D.N.Y. 2021)..........................................................................13

*Perkins Sch. for the Blind* v. *Maxi-Aids, Inc.*,
    274 F. Supp. 2d 319 (E.D.N.Y. 2003) .......................................................................19

*Polaroid Corp.* v. *Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)......................................................................................16

*Polymer Tech. Corp.* v. *Mimran*,
    975 F.2d 58 (2d Cir. 1992)........................................................................................18

*Rado Watch Co.* v. *ABC Co.*,
    1992 WL 142747 (S.D.N.Y. June 8, 1992) ..............................................................17

*Ryan* v. *Volpone Stamp Co.*,
    107 F. Supp. 2d 369 (S.D.N.Y. 2000)..........................................................10, 16, 23

*Saban Entm't, Inc.* v. *222 World Corp.*,
    865 F. Supp. 1047 (S.D.N.Y. 1994)..........................................................................23

*Southland Corp.* v. *Froelich*,
    41 F. Supp. 2d 227 (E.D.N.Y. 1999) .........................................................................16

*Stern's Miracle-Gro Prods., Inc.* v. *Shark Prods. Inc.*,
    823 F. Supp. 1077 (S.D.N.Y. 1993)..........................................................................16

*Structured Capital Solutions, LLC* v. *Commerzbank AG*,
    177 F. Supp. 3d 816 (S.D.N.Y. 2016)........................................................................13

*Sunward Elecs., Inc.* v. *McDonald*,
    362 F.3d 17 (2d Cir. 2004)........................................................................................15

*Thomas E. Hoar, Inc.* v. *Sara Lee Corp.*,
  164 F.3d 619, 1998 WL 667836 (2d Cir.1998) ........................................................11

*Tri-Star Pictures, Inc.* v. *Unger*,
  14 F. Supp. 2d 339 (S.D.N.Y. 1998)........................................................................17

*Twentieth Century Fox Film Corp.* v. *Marvel Enters., Inc.*,
  220 F. Supp. 2d 289 (S.D.N.Y. 2002)......................................................................20

*Two Hands IP LLC* v. *Two Hands Am., Inc.*,
  563 F. Supp. 3d 290 (S.D.N.Y. 2021).................................................................21, 22

*U.S. Polo Ass'n* v. *PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011)......................................................................20

*Vinci Brands LLC* v. *Coach Servs.*,
  2023 WL 5950690 (S.D.N.Y. Sept. 13, 2023)................................................. *passim*

*Virgin Enter. Ltd.* v. *Nawab*,
  335 F.3d 141 (2d Cir. 2003)....................................................................................17

*Warner-Lambert Co.* v. *Northside Dev. Corp.*,
  86 F.3d 3 (2d Cir. 1996)..........................................................................................25

*Yang* v. *Kosinski*,
  960 F.3d 119 (2d Cir. 2020)......................................................................................9

*Yurman Design, Inc.* v. *PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001)....................................................................................21

## RULES

Fed R. Civ. Pro. 65........................................................................................1, 3, 25

## OTHER AUTHORITIES

15 U.S.C. § 1115.....................................................................................................15

15 U.S.C. § 1116(a)................................................................................................21

17 U.S.C. § 410(c) ..................................................................................................21

Plaintiff World Wrestling Entertainment, LLC (f/k/a World Wrestling Entertainment, Inc.) ("WWE") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction and temporary restraining order against Defendant Panini S.p.A. ("Panini").

## PRELIMINARY STATEMENT

This motion seeks to enjoin Panini, a sports and entertainment collectibles company, from continuing to sell, advertise, and/or distribute WWE products and merchandise. Panini is acting in bad faith, without any authorization by WWE, and in violation of the parties' now terminated Consumer Product License Agreement, dated January 1, 2022 (the "License Agreement" or "Agreement").

WWE is a well-known brand that holds itself to a high standard. In January 2022, WWE granted Panini a limited license to use WWE's intellectual property. Specifically, the Agreement expressly obligated Panini to (i) create prototypes of each item of the Licensed Products and submit them for WWE's approval and (ii) make the Licensed Products available for sale both in-store and online by June 1, 2022. However, Panini failed to create prototypes, and seek WWE's approval, of items within the "Physical Trading Card Games" or the "Digital Trading Cards" Licensed Product categories. Panini also failed to have Licensed Products in those categories available for sale by June 1, 2022, thereby breaching the Agreement. Accordingly, pursuant to its rights under the Agreement, WWE terminated the Agreement on August 25, 2023.

Upon termination of the License Agreement, Panini was no longer entitled or authorized to accrue benefits from the License Agreement or WWE's intellectual property. However, despite being contractually obligated to remove from its website and return any WWE product or marks, Panini has continued to sell, advertise, and/or distribute these products. Panini also has falsely continued to hold itself out as an official licensee of WWE products. Panini's brazen unauthorized

use of WWE's intellectual property is intended to take unfair advantage of WWE's prestige and goodwill in order to sell products. Although Panini has no right to do so, Panini has and will continue to obtain the benefits of the reputation and consumer goodwill that WWE has garnered and enjoy the benefits of being an official licensee, when in fact it is not.

Panini's conduct—which is a clear violation of WWE's intellectual property rights and constitutes blatant disregard of the termination provisions of the License Agreement—warrants immediate injunctive relief.

Panini is in willful breach of the License Agreement, which prohibits the very conduct complained of here. Panini agreed that it would, upon WWE's termination of the License Agreement, (i) immediately and permanently discontinue using WWE's intellectual property, (ii) immediately and permanently discontinue manufacturing, selling, advertising, distributing, and using the products WWE licensed to Panini, and (iii) deliver to WWE or destroy (at WWE's sole discretion) any remaining inventory of the products WWE licensed to Panini. None of these agreed-upon promises have been fulfilled.

Panini's conduct also constitutes a classic case of trademark infringement and unfair competition under federal and New York state law. The WWE trademarks are inherently distinctive and have acquired secondary meaning. Panini's unauthorized use is likely to cause confusion in the marketplace. Indeed, where, as here, Panini is WWE's former licensee and Panini's copying is intentional, likelihood of confusion is presumed.

Moreover, Panini's conduct constitutes dilution of WWE's famous trademarks. By using WWE's marks with predatory intent to associate its products with WWE, Panini is blurring and tarnishing WWE's trademarks.

For similar reasons, Panini's conduct is a classic case of copyright infringement. Panini is using WWE's copyrighted works without WWE's authorization.

As a result of Panini's unlawful conduct, WWE is suffering irreparable harm to its business, brand, goodwill, and reputation. As a matter of contract, Panini agreed in section L(5) of the License Agreement that breach of the Agreement would result in irreparable harm. And clauses such as this one that stipulate irreparable harm are "entitled to weight." *JTH Tax, LLC* v. *Agnant*, 62 F.4th 658, 674 (2d Cir. 2023) (quoting *Baker's Aid, Inc.* v. *Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987)). In addition, as a matter of law, irreparable harm is presumed where, as here, WWE is likely to succeed on its claims. Finally, the irreparable harm here is obvious and severe. WWE is a brand founded and built on a reputation for and a commitment to excellence—a reputation that is no longer in its control and could be irreparably soiled by the conduct of Panini in listing and selling these products in a way that is not up to the standards of WWE. Further, it is undeniable that given the prior association and authorization, consumer confusion is inevitable; finally, there is a high likelihood of dilution of the brand since WWE is unable to control the licensing of its marks.

Accordingly, WWE respectfully submits that this motion for a preliminary injunction and a temporary restraining order pursuant to Federal Rule of Civil Procedure 65 should be granted.

## FACTUAL BACKGROUND

I.   **WWE**

Since at least as early as February 1983, WWE and its previous iterations have provided live and prerecorded wrestling and entertainment events and services (the "WWE Wrestling Services") under various service marks. Since May 2002, those service marks have included WORLD WRESTLING ENTERTAINMENT®, WWE®, and the WWE logo. Declaration of Scott Zanghellini ("Zanghellini Decl.") ¶ 2.

WWE's unique product, for which it coined the term "sports entertainment," is best described as an action-adventure episodic drama that is akin to an ongoing, ever-developing soap opera based on WWE's distinctive and provocative characters. *Id.* ¶ 3. WWE creates colorful characters that generally appear under a trademarked name and are distinctively delineated with unique persona, history, storyline, relationships, music, visual appearance, and behavior. *Id.*

WWE promotes hundreds of live shows each year in arenas and stadiums around the world. WWE also produces weekly television programs on broadcast and cable television that are distributed around the world, monthly "pay-per-view"/special event programs and other original content available through a subscription to the WWE Network, which is an online subscription with Peacock, the streaming service from NBCUniversal. *Id.* ¶ 4.

WWE also engages in an extensive licensing program pursuant to which WWE's copyrighted characters, trademarks, service marks and other intellectual property rights are depicted on myriad consumer products. *Id.* ¶ 5.

## II.     The WWE-Panini License Agreement

In March 2022, WWE and Panini entered into a License Agreement. Compl. Ex. A. Pursuant to the Agreement, WWE granted Panini the right and license to use certain WWE intellectual property approved by WWE in writing under the terms of the Agreement in connection with the manufacture, distribution, and sale of certain expressly enumerated products (the "Licensed Products"). *Id.* § 1(f). Specifically, WWE granted Panini exclusive rights to the following products, each of which is defined in the Agreement: (i) physical trading cards, (ii) physical trading card games, (iii) physical stickers, and (iv) physical collector albums. *Id.* § 2(a)(i), Schedule A. WWE also granted non-exclusive rights to digital trading cards, which are also defined in the Agreement. *Id.* As consideration for the rights WWE granted to Panini under the Agreement, Panini agreed to pay WWE ███████████████████████████████

9

███████████████████████████████████████████

████████████████████████████████ The Agreement had a term of January 1, 2022

through December 31, 2025, unless terminated earlier pursuant to its terms. *Id.* § 3.

The Agreement contains multiple provisions specifying ways that WWE could lawfully

terminate it, two of which are relevant here. *First*, according to section B(1)(a) of the Agreement,

which governs Panini's obligation to make a "good faith effort to exploit rights," "[i]f within three

(3) months of the Effective Date of this Agreement, Licensee has failed to take good faith steps to

exploit the rights granted to it, including the creation of prototypes of each item of the Licensed

Products and seeking to obtain WWE's approval of same, or if Licensee has failed to make the

Licensed Products available for sale both in-store and online by no later than June 1, 2022," then

"WWE shall have the immediate right to: terminate this Agreement; rescind the exclusive nature

of any rights granted under this Agreement; or delete individual products from the definition of

Licensed Products in subparagraph 1(f), as shall be determined by WWE in its sole discretion."

*Id.* § B(1)(a). *Second*, under section L(l)(a)(ii) of the Agreement, which governs WWE's right to

terminate, "[i]f three (3) months after the Effective Date of this Agreement by WWE, Licensee

failed to take good faith steps to exploit the rights granted to it, including the creation of prototypes

of each item of the Licensed Products and seeking to obtain WWE's approval of same, or if

Licensee has failed to make the Licensed Products available for sale both in-store and online by

no later than June 1, 2022," then WWE shall have the right to terminate the Agreement

immediately. *Id.* § L(l)(a)(ii).

In other words, the Agreement expressly provides WWE the right to terminate it if, (i) after

three months after the Effective Date (which would have been April 1, 2022), Panini failed to

create prototypes and seek WWE's approval of the Licensed Products or (ii) Panini failed to make the Licensed Products available for sale both in-store and online by June 1, 2022.

## III.     WWE's Termination of the License Agreement Following Panini's Breach

Panini never created any prototypes, or sought to obtain WWE's approval, of any items within the "Physical Trading Card Games" or the "Digital Trading Cards" Licensed Product categories.  Zanghellini Decl. ¶ 15.  Nor were Licensed Products in those categories available for sale by June 1, 2022.  *Id.*  Such failures negatively affected WWE's total earnings under the Agreement with respect to payments payable to WWE.  *Id.*

Accordingly, on August 25, 2023, WWE delivered a letter to Panini to formally notify Panini that, pursuant to sections L(l)(a)(ii) and B(l)(a) of the Agreement, WWE was terminating the Agreement for cause (the "Termination Letter"), effective as of the date of the Termination Letter.  Compl. Ex. B.  Under the terms of the License Agreement, WWE's termination for cause pursuant to sections L(l)(a)(ii) and B(l)(a) of the Agreement, triggered certain obligations by Panini to WWE.  In particular:

- under section L(3) of the Agreement, Panini was required to immediately and permanently discontinue using the WWE intellectual property; immediately destroy any films, molds, dies, CDs, electronic data files, patterns, or similar items from which the Licensed Products and advertising materials were made, where any element of the WWE intellectual property is an integral part thereof; and immediately terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products;

- under section L(2) of the Agreement, Panini was required to deliver to WWE at no cost or destroy any remaining inventory of Licensed Product and provide a notarized certificate of destruction to WWE;

- under sections 4 and L(2) of the Agreement, Panini was required to pay WWE ███████ ███████████████████████████████████████████████████████ ; and

- under section 6 of the Agreement, Panini (along with its parent, subsidiaries, affiliates, successors, assigns, and related companies)



Compl. Ex. A. WWE's termination notice was proper, as it complied with the terms of the Agreement. *Id.* § N(6); *see* Zanghellini Decl. ¶ 17.

## IV.    Panini's Unlawful Activities

Notwithstanding WWE's lawful termination of the License Agreement on August 25, Panini continued to infringe on WWE's intellectual property right by, among other things, continuing to sell, advertise, distribute, and/or use certain WWE intellectual property, many of which continue to be listed on Panini's website, without WWE's authorization and in violation of Panini's obligations to WWE under the termination provisions of the License Agreement. Examples of these infringements are attached as Exhibit E to WWE's Complaint and include 2023 Panini Instant WWE physical trading cards for WWE talent "The American Nightmare" Cody Rhodes, Shayna Baszler, Seth "Freakin" Rollings, Roman Reigns, Jimmy USO, Gunther, Bianca Belair, Dominik Mysterio, and Carmelo Hayes, a forthcoming 2023 Panini Donruss Elite WWE Trading Card Box, 2022 Chronicles WWE Signatures Red Trading Cards for Noam Dar, a WWE Complete 2022 Physical Sticker Collection, and a collection of WWE missing physical stickers. Further, Panini has held, and continues to hold, itself out as "officially licensed" by WWE when, in truth, it is not officially licensed by WWE.

On August 29, 2023, Panini's lawyers responded to WWE's August 25, 2023 termination letter disputing both the validity of and WWE's articulated bases for WWE's termination of the Agreement.  Compl. Ex. C.  Then on August 31, 2023, WWE, through its outside counsel, responded to the August 29, 2023 letter, articulating WWE's disagreement with Panini's position and reiterating that Panini may no longer use WWE's intellectual property in any way.  Compl. Ex. D.  However, Panini refused to comply.  Accordingly, on September 8, 2023, WWE, through outside counsel, sent Panini a letter demanding that Panini immediately cease its infringing activity and comply with all of the Agreement's provisions relating to its termination.  Compl. Ex. F.  That letter further demanded that Panini confirm in writing by September 13, 2023 that Panini will comply with all of its obligations under the Agreement.  *Id.*

Upon hearing nothing from Panini, and out of concern that Panini's outside counsel may have missed WWE's August 31 and September 8 correspondence and that the ongoing infringement may have been inadvertent, on September 14, 2023, WWE, through outside counsel, contacted Panini's outside counsel by telephone and via email to confirm that Panini had received WWE's prior correspondence.  Declaration of Gregory F. Laufer ("Laufer Decl.") ¶ 7.  At that time Panini's counsel confirmed that he had previously received, but until September 14 had missed, WWE's prior correspondence dated August 31 and September 8, 2023.  *Id.*; *see* Compl. Ex. G.  WWE requested that Panini respond to WWE's prior written correspondence by 12:00 PM Eastern Time on September 15, 2023.  Laufer Decl. ¶ 7; Compl. Ex. G.

At 12:04 PM Eastern Time on September 15, 2023, WWE, through outside counsel, contacted Panini's counsel again to ask if Panini intended to respond that day to WWE's numerous demands that it comply with its obligations.  Laufer Decl. ¶ 8; Compl. Ex. H.  Panini's counsel responded that Panini likely would not respond until Monday, September 18, 2023.  Compl. Ex.

H.  In light of this representation and with the hope that WWE and Panini could resolve Panini's ongoing infringement without court intervention, WWE waited to commence this action and seek emergency relief from the Court.

On September 18, 2023, WWE received a letter from Panini's counsel contesting the validity of WWE's termination of the Agreement, Compl. Ex. J, thus making clear that Panini's ongoing infringement was intentional and would not cease without a court order.

To date, notwithstanding WWE's repeated demands that Panini cease its unlawful conduct, Panini has refused to comply with its obligations under the terminations of the License Agreement and has acted as if WWE never terminated the Agreement.  Zanghellini Decl. ¶¶ 19–20, 22–25. Critically, Panini's infringing conduct has not ceased, and it has failed to pay the monies owed to WWE under the Agreement.  *Id.* ¶ 19.

## **ARGUMENT**

To prevail on a motion for a preliminary injunction or a temporary restraining order, the movant must show:  (1) irreparable harm, (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, (3) that the balance of hardships tips decidedly in the movant's favor, and (4) that the public interest would not be disserved by the issuance of the injunction.  *See Yang* v. *Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020); *Benihana, Inc.* v. *Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  Courts in this circuit routinely grant preliminary injunctions and temporary restraining orders where, as here, the defendant has infringed on plaintiff's trademark.  *See, e.g.*, *Vinci Brands LLC* v. *Coach Servs.*, 2023 WL 5950690, at *13 (S.D.N.Y. Sept. 13, 2023) (barring former licensee from continuing to use the licensor's intellectual property following termination of license agreement); *Ryan* v. *Volpone Stamp Co.*, 107 F. Supp. 2d 369, 405 (S.D.N.Y. 2000) (preliminary injunction

for former baseball player when memorabilia company continued using his trademark after license expired).

As detailed below, WWE easily satisfies the standard here for a preliminary injunction and a temporary restraining order .

## I.     WWE Is Likely to Succeed on the Merits of Its Claims

### A.     Panini Breached the Terms of the License Agreement

To state a claim for breach of contract under New York law, plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

Here, Panini cannot dispute that a valid contract exists—the License Agreement.  WWE fulfilled its obligations under the Agreement, while Panini did not.  Specifically, the Agreement expressly obligated Panini to (i) create prototypes of each item of the Licensed Products and submit them for WWE's approval and (ii) make the Licensed Products available for sale both in-store and online by June 1, 2022.  However, Panini failed to create prototypes and it failed to seek WWE's approval of items within the "Physical Trading Card Games" or the "Digital Trading Cards" Licensed Product categories.  Zanghellini Decl. ¶¶ 15, 21.  Panini also failed to have Licensed Products in those categories available for sale by June 1, 2022, thereby breaching the Agreement and causing damage to WWE. *Id.*

To date, Panini has raised to WWE five principal excuses as to why no breach by Panini has occurred, *see* Compl. Exs. C & J.  Each excuse is meritless.  *First*, Panini argues that "the purported termination is nothing more than a pretext to seek to substitute Fanatics (or its subsidiary Topps) as an exclusive licensee in disregard of Panini's rights, which continue for several

additional years." Compl. Ex. C. at 2. However, it is well established that motive is irrelevant. *See HLT Existing Franchise Holding LLC* v. *Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014).[1]

*Second*, Panini contends that the Agreement did not require Panini to have "launched" a product for each category of "Licensed Products" for which Panini acquired rights by June 1. Compl. Ex. J at 1. That is inaccurate. Section B(1)(a) of the Agreement required Panini to "create[e] prototypes *of each item of the Licensed Products*," Compl. Ex. A § B(1)(a) (emphasis added), which Panini did not do. Zanghellini Decl. ¶¶ 15, 21.

*Third*, Panini asserts that, even if the Agreement required Panini to have launched a product for each category of "Licensed Products" for which Panini acquired rights under the Agreement, Panini satisfied the "Digital Trading Cards" requirement by (i) including images of Panini's Prizm cards on Panini's website dating to the time of the launch of the physical trading cards, and satisfied the "Physical Trading Card Games" requirement by (ii) offering Box Wars and/or Pack Wars with the Prizm cards. Compl. Ex. J at 1. None of the identified items, however, constitute "Digital Trading Cards" or "Physical Trading Card Games" under the Agreement. Zanghellini Decl. ¶ 21.

The photograph images of Panini's physical Prizm cards are merely Advertising Material (as defined in the Agreement) of the physical versions of the trading cards, not "Digital Trading Cards" as defined in the Agreement. *See* Compl. Ex. A § 1(a), Schedule A; Zanghellini Decl.

---

[1] *See also Major Oldsmobile, Inc.* v. *Gen. Motors Corp.*, 101 F.3d 684, 1996 WL 280452 at *3 (2d Cir. 1996) ("As long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract."); *Thomas E. Hoar, Inc.* v. *Sara Lee Corp.*, 164 F.3d 619, 1998 WL 667836 at *1 (2d Cir.1998) ("We agree with the district court that [plaintiff's] nonpayment furnished a good faith reason to terminate for cause and made any allegations of other improper motives irrelevant to a determination of good faith performance."); *Farberware Licensing Co. LLC* v. *Meyer Mktg. Co., Ltd.*, 2009 WL 2710209, at *2 (S.D.N.Y. Aug. 25, 2009) (it is a "well-established rule that motive is irrelevant to the issue of whether a nonbreaching party properly terminated a contract where that party has established an independent legal right to terminate").

¶ 21(b).  The images themselves have never been available for sale as a digital product and were never advertised or sold as such.  Zanghellini Decl. ¶ 21(b).  Panini's own conduct indicates that Panini understands and appreciates this distinction:  per Section 4(b)(i) of the Agreement, ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████.  *Id.*; Compl. Ex. A § 4(b)(i).

*Fourth*, Panini complains that, because the Agreement was signed on March 14, 2022, Panini had only 77 days to launch new products to meet the June 1, 2022 deadline.  Compl. Ex. C at 1.  As an initial matter, the timing is irrelevant, as Panini indisputably agreed to comply with its obligations by June 1, 2022, and cannot now argue otherwise.  Compl. Ex. A §§ B(1)(a), L(l)(a)(ii).  Moreover, Panini's argument is factually wrong.  The June 1, 2022 deadline to make the Licensed Products available for sale both in-store and online also was an agreed-upon term in the binding Term Sheet that preceded the Agreement and which was executed by the parties in July 2021.  Zanghellini Decl. ¶¶ 8, 14.  Accordingly, Panini had approximately 11 months to meet the June 1, 2022 deadline.

*Finally*, Panini's contention that WWE waived any right to terminate the Agreement or is otherwise estopped from terminating the Agreement, *see* Compl. Exs. C & J, fails on its face and is in direct conflict with the clear language of section N(4) of the Agreement, which states that "WWE's failure to perform or act upon any provision of this Agreement or WWE's breach hereof, will not constitute or be deemed a waiver of any of WWE's rights hereunder and such rights shall be exercisable when it is deemed appropriate by WWE."  Compl. Ex. A § N(4).  "New York courts

'uniformly enforce' these types of clauses." *Optima Media Group Limited* v. *Bloomberg L.P.*, 2021 WL 1941878, at \*14 (S.D.N.Y. 2021).[2]   Accordingly, WWE was not precluded from exercising its right to terminate the Agreement on August 25, 2023, and was explicitly authorized to exercise this right when it deemed appropriate.

Additionally, WWE had no duty to provide Panini an opportunity to cure the default. While Panini could have easily negotiated for that right, the Agreement simply does not provide for it.  In relevant part, the Agreement grants WWE in its sole discretion the immediate right to terminate the Agreement.  *See* Compl. Ex. A §§ B(1) and L(1).  Panini is now attempting to re-write the Agreement and improperly use the implied covenant of good faith to add wholly new terms to the contract.  The implied covenant does not, however, operate to create new contractual rights; it simply "ensures that parties to a contract perform the substantive, bargained-for terms of their agreement" and that parties are not unfairly denied "express, explicitly bargained-for benefits." *Metropolitan Life Ins. Co.* v. *RJR Nabisco Inc.*, 716 F. Supp. 1504, 1516 n.20, 1517, 1519 (S.D.N.Y. 1989); *see Don King Productions, Inc.* v. *Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990).  In short, where a party has a right to terminate a contract on notice, the implied covenant cannot negate the right of termination or read into it additional requirements.  *See HLT*, 994 F. Supp. 2d at 537.

### B.   Panini Has Breached and Is Continuing to Breach the Termination Provisions of the License Agreement

Panini also has breached the termination provisions of the License Agreement by using WWE's intellectual property without authorization, contrary to the express terms of the Agreement.

---

[2]   Under New York law, waiver must be voluntary and intentional and should not be inferred.  *See Structured Capital Solutions, LLC* v. *Commerzbank AG*, 177 F. Supp. 3d 816, 824–25 (S.D.N.Y. 2016).

As an initial matter, WWE's August 25, 2023 termination of the License Agreement was lawful.  The Agreement expressly provides WWE the right to terminate it if, after three months, Panini failed to (i) create prototypes and seek WWE's approval of the Licensed Products or (ii) make the Licensed Products available for sale both in-store and online by June 1, 2022.  Compl. Ex. A §§ B(1)(a), L(1)(a)(ii).  As discussed in Part I.A, Panini failed in both respects.  WWE thereafter provided written notice pursuant to the terms set forth in section N(6) of the Agreement.  *Id.* § N(6).  As such, WWE's termination was lawful and valid under the express terms of the Agreement.

WWE's lawful termination of the License Agreement triggered additional contractual obligations on the part of Panini.  Specifically, under section L(2) of the Agreement, Panini was required to immediately cease manufacturing, selling, advertising, distributing, and using WWE Licensed Products and to deliver to WWE any remaining inventory of Licensed Products.  *Id.* § L(2).  Section L(3) further states that Panini must "immediately and permanently . . . discontinue using the WWE Intellectual Property."  *Id.* § L(3).

Panini, however, has not fulfilled any of these contractual obligations.  Zanghellini Decl. ¶ 19.  To the contrary, Panini has continued to, at a minimum, sell, advertise, distribute, and use WWE's Licensed Products and use WWE's intellectual property on its website.  *Id.* ¶¶ 19–20, 22–25; Compl. Ex. E.  Because such conduct clearly contravenes Panini's contractual obligations to WWE under the terms of the License Agreement, WWE is likely to succeed on the merits of its contract claim.[3]

---

[3]   Further, "when a licensor terminates a trademark licensing '[a]greement[ ] in accordance with [its] terms,' the continued use of the mark is 'unlicensed and unlawful under the Lanham Act.'"  *Krispy Kreme Doughnut Corp.* v. *Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 393 (S.D.N.Y. 2010) (enjoining franchisee's use of franchisor's mark); *see also Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("The continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes . . . trademark infringement."); *Flawless Style LLC* v. *Saadia Group LLC*, 2023 WL 3687782, at *2 (S.D.N.Y. May 26, 2023).

### C.        Panini's Conduct Infringes WWE's Trademarks

Panini's contractual violations also infringe WWE's intellectual property rights.   To succeed on a Lanham Act trademark infringement claim, plaintiff must demonstrate that (1) the trademark is valid and entitled to protection and (2) defendant's use of the trademark is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services. *See Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216–17 & n.9 (2d Cir. 2012).   WWE easily satisfies this showing for its trademark infringement claims.

### 1.        WWE's Trademarks Are Valid

The WWE trademarks, which WWE and its prior iterations have used continuously since 2002, are presumed to be distinctive and its numerous incontestable trademark registrations constitute conclusive proof that the marks are entitled to legal protection.   Federal registration constitutes prima facie evidence of a mark's validity and ownership.   15 U.S.C. § 1115(a); *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2297 (2019); *Lane Capital Mgmt., Inc.* v. *Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *Louis Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986).   Incontestable trademark registrations serve as "conclusive evidence" of same.   15 U.S.C. § 1115(b).

### 2.        Panini's Use of the Trademarks Is Presumed, and Likely, to Cause Confusion

Because Panini is WWE's former licensee and is engaging in wholesale and intentional copying, likelihood of confusion is presumed. *See, e.g.*, *L & L Wings, Inc.* v. *Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law."); *Volpone Stamp Co.*, 107 F. Supp. 2d at 399 ("In the licensing framework, where the alleged unauthorized user of the

trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established."); *N.Y. State Soc'y of Cert. Pub. Accountants* v. *Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (where the trademark infringement is the result of intentional copying, "likelihood of confusion will be presumed as a matter of law"); *see also C=Holdings B.V.* v. *Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013); *Southland Corp.* v. *Froelich*, 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999).

Because likelihood of confusion exists as a matter of law, it is not necessary to analyze the likelihood of confusion factors set forth in *Polaroid Corp.* v. *Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), which include:  (1) the strength of the mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) bad faith; (7) the quality of defendant's product; and (8) the sophistication of buyers.  *Id.* at 495.  But, even if it were necessary, the *Polaroid* factors also strongly support a finding of likelihood of confusion here.

*WWE's trademarks are indisputably strong and distinctive.*  *See supra* p. 4.  WWE's trademarks also have acquired strong secondary meaning in the marketplace as a result of the tremendous success as well as widespread and unsolicited press and media coverage that WWE products and services have enjoyed, *see* Zanghellini Decl. ¶ 7; *Stern's Miracle-Gro Prods., Inc.* v. *Shark Prods. Inc.*, 823 F. Supp. 1077, 1085 (S.D.N.Y. 1993), and as further evidenced by Panini's deliberate copying of the marks, *Tri-Star Pictures, Inc.* v. *Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998).

*Panini is using the exact same trademarks.*  Notwithstanding WWE's termination of Panini's license, Panini is continuing to manufacture, sell, and/or advertise the same trading cards and stickers bearing WWE's intellectual property.  *See Cadbury Beverages, Inc.* v. *Cott Corp.*, 73

F.3d 474, 480 (2d Cir. 1999) (identical marks are "similar" as a matter of law); *Rado Watch Co.* v. *ABC Co.*, 1992 WL 142747, at *4 (S.D.N.Y. June 8, 1992) (granting injunction where it was "exceedingly difficult" to distinguish between the authentic and infringing goods).

**The products are in the same market.** Panini's trading cards and stickers compete in the same market in which WWE's products are sold and target the same consumers. Zanghellini Decl. ¶ 26; *see Virgin Enter. Ltd.* v. *Nawah*, 335 F.3d 141, 150 (2d Cir. 2003) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."). And where, as here, a former licensee uses the same trademark in the same market, "likelihood of confusion is inevitable." *Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 40 (E.D.N.Y. 2001) (further noting that "[s]uch cases are open and shut").

**Panini's bad faith is manifest.** Panini's copying here is deliberate, thus showing bad faith. Upon terminating the License Agreement, WWE explicitly reminded Panini of its contractual obligations under the termination provisions. Compl. Ex. B. Just a few days later, upon observing that Panini continued to publicly advertise products using WWE's intellectual property, WWE sent Panini a cease-and-desist letter in which it again reminded Panini of its contractual obligations under the License Agreement and demanded compliance. Compl. Ex. F. Panini, however, simply continued to help itself to WWE's intellectual property in order to sell the same products to the same consumers. *See, e.g.*, Compl. Ex. E. Moreover, on September 15, 2023, and notwithstanding WWE's termination of the Agreement, Panini emailed WWE with a forecast reflecting projections through August 2023 for sales of products bearing WWE's intellectual property. Zanghellini Decl. ¶ 20; Compl. Ex. I. WWE did not reply to this email, as it was awaiting the receipt of Panini's counsel's promised response. It is evident that Panini intended the public to identify its products

with those of WWE, as Defendant's own website continues to represent (falsely) that Panini is officially licensed by WWE. *See GTFM, Inc.* v. *Solid Clothing Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (where similarities "are so strong that they could only have occurred through deliberate copying[,] . . . a presumption arises that the copier has succeeded in causing confusion").

**WWE should not be held hostage to Panini's lack of quality control.** It is well settled that a trademark holder is entitled to maintain "the control of quality." *Polymer Tech. Corp.* v. *Mimran*, 975 F.2d 58, 62 (2d Cir. 1992). Thus, because WWE has no control over the quality of Panini's infringing products, *see* Zanghellini Decl. ¶¶ 28–29, this factor further supports a finding of likelihood of confusion. Moreover, even if Panini's infringing products were of similar quality to authorized WWE goods, that similarity would only further reinforce the likelihood of confusion here. *See Morningside Grp., Ltd.* v. *Morningside Cap. Grp., L.L.C.*, 182 F.3d 113, 142 (2d Cir. 1999) ("Products of equal quality may tend to create confusion as to source because of that very similarity of quality.").

**Consumers are likely to exercise a low degree of care.** The products at issue in this case are inexpensive. The trading cards bearing WWE intellectual property that Panini continues to market are typically listed as costing $29.99 or $49.99, while stickers bearing WWE intellectual property cost just $0.40. *See* Compl. Ex. E. As a result, consumers are less likely to exercise a great deal of care and more likely to be confused about the source of Panini's infringing products. *See Friesland Brands, B.V.* v. *Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 411 (S.D.N.Y. 2002) (purchasers of relatively inexpensive goods are held to "lesser standard of purchasing care"); *Krevat* v. *Burgers to Go, Inc.*, 2014 WL 4638844, *10 (E.D.N.Y. Sept. 16, 2014) ("Buyer sophistication is generally low where inexpensive products are involved." (quotation marks omitted)).

\*      \*      \*

In sum, a balancing of the *Polaroid* factors—to the extent relevant at all given the legal presumption of confusion applicable here—makes clear that there is a strong likelihood of confusion in this case. Thus, WWE is likely to succeed on the merits of its trademark infringement claims.

**D.      Panini's Unauthorized Use Dilutes the Value of WWE's Trademarks**

Panini's brazen use of the WWE trademarks also dilutes their value. To prove dilution, a plaintiff must show that: "(1) the senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3) defendant's use of the junior mark began after the senior mark became famous; and (4) a likelihood of dilution." *N.Y.C. Triathlon* v. *NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 321 (S.D.N.Y. 2010). The WWE trademarks are famous and were in widespread commercial use before the Panini products launched. *See supra* pp. 3–4. Panini's unauthorized use of the WWE trademarks both blurs and tarnishes the exclusive association that consumers have with products and services of WWE, thus diluting the WWE trademarks. *See N.Y.C. Triathlon*, 704 F. Supp. 2d at 322 ("Blurring occurs when there is a possibility that the mark will lose its ability to serve as a unique identifier of an owner's product." (internal quotation marks omitted)); *Perkins Sch. for the Blind* v. *Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 326 (E.D.N.Y. 2003) ("The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use."). Because the facts giving rise to a claim for unfair competition under the Lanham Act are the same as a claim for trademark infringement, on which WWE has demonstrated the likelihood of success, *see supra* Part I.C, WWE is likely to prevail on its claim for unfair competition as well. *Twentieth Century Fox Film Corp.* v. *Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[I]t is well settled that the standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the

same as for trademark infringement claims under Section 32.").  In addition, because the elements required to prevail on claims for trademark infringement, unfair competition, and trademark dilution under New York law mirror the same claims under the Lanham Act, on which WWE is likely to succeed (*see supra* Part I.C), WWE also is likely to succeed on its claims under New York law.  *See U.S. Polo Ass'n* v. *PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013); *Oleg Cassini, Inc.* v. *Weber's 32nd St. Corp.*, 2008 WL 2780988, at *2 n.4 (S.D.N.Y. July 15, 2008) ("New York's anti-dilution statute, General Business Law section 360-1, is analyzed in the same manner as claims arising under the Federal Trademark Dilution Act."); *see also Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) (lower court erred in denying preliminary injunction on state law trademark infringement and unfair competition claims for same reasons stated in discussion of federal claims).

### E.      Panini's Conduct Infringes WWE's Copyrights

To succeed on a copyright infringement claim, plaintiff must demonstrate (1) ownership in a valid copyright and (2) infringement of the copyright by defendant.  *See Feist Publc'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  WWE easily satisfies both prongs.

#### 1.      WWE's Copyrights Are Valid

The Copyright Act provides that a "certificate of a [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright."  17 U.S.C. § 410(c).  Absent a certificate of registration within that timeframe, the "evidentiary weight to be accorded the certificate . . . shall be within the discretion of the court."  *Id.*  The works at issue here include photographs of WWE footage, the certificates of copyright registration for which were obtained within five years of first publication and are thus entitled to the statutory presumption of validity.  Zanghellini Decl. ¶ 24.

**2.      Panini's Use of the Copyrights Is Unauthorized and Unlawful**

To establish infringement, the copyright owner must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." *Yurman Design, Inc.* v. *PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001) (emphasis omitted) (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).  Here, Panini's infringement is plain. After WWE terminated Panini's license to use WWE's copyrights, Panini continued to use the copyrights without WWE's authorization.

Thus, WWE is likely to succeed on the merits of its copyright infringement claims.

**II.      WWE Will Suffer Irreparable Harm If Panini Is Not Immediately Restrained**

Where, as here, plaintiff in a trademark infringement case demonstrates a likelihood of success on the merits (*see supra* Part I), irreparable harm is presumed.  15 U.S.C. § 1116(a); *Vinci Brands LLC*, 2023 WL 5950690, at *9–10; *Two Hands IP LLC* v. *Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021).  WWE has made that showing here and Panini will be unable to rebut that presumption; to the contrary, Panini has already agreed that "any breach by Licensee of this Agreement will cause irreparable injury and harm to the WWE" in light of the "special, unique and extraordinary character" of WWE's intellectual property.  Compl. Ex. A § L(5). Accordingly, this Court should enjoin Panini from further use of the WWE intellectual property.

In the absence of an injunction, the potential harm to WWE's reputation and business is immeasurable.  In *Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986), the Second Circuit held that "in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case.  When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic."  The court added that "irreparable harm

exists in a trademark case when the party seeking the preliminary injunction shows that it will lose control over the reputation of its trademark pending trial.  Control of the trademark is crucial in the licensing context because a licensor who fails to monitor its mark risks a later determination that it has been abandoned." *Id.* at 43 (internal quotation marks and citations omitted).

The decision by WWE to license and thereby authorize others to use its trademarks is not made lightly; rather, such endorsement is provided only after a determination has been made that certain quality standards are complied with.  Zanghellini Decl. ¶ 29.  However, WWE no longer has this oversight over Panini, its former licensee.  By taking from WWE the ability to control its reputation, Panini is harming WWE in a way that cannot be quantified and therefore is irreparable. As courts in this circuit routinely recognize, it is of paramount importance for a trademark owner to be able to control its brand—and, by extension, the brand's reputation—through rigorous enforcement of its trademark rights.  *See Two Hands IP LLC*, 563 F. Supp. 3d at 300 ("Irreparable harm exists in a trademark case 'when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because reputation is 'not calculable nor precisely compensable.'" (quoting *Power Test Petrol Distribs., Inc.* v. *Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)); *N.Y.C. Triathlon*, 704 F. Supp. 2d at 325 ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard."); *see also Church of Scientology Int'l*, 794 F.2d at 43; *Vinci Brands LLC* v. *Coach Servs.*, 2023 WL 5950690, at *9–10; *Saban Entm't, Inc.* v. *222 World Corp.*, 865 F. Supp. 1047, 1056 (S.D.N.Y. 1994); *Kraft Gen. Foods, Inc.* v. *Allied Old English, Inc.*, 831 F. Supp. 123, 136 (S.D.N.Y. 1993).

Moreover, Panini's unauthorized use of WWE's intellectual property damages WWE's relationships and potential relationships with its other licensees and business partners and dilutes

the brand.  It makes it extremely difficult to grant use of its mark to potential licensees, and damages the value of the licenses offered.  Zanghellini Decl. ¶ 30.  If unauthorized third parties are able to obtain the benefits of using WWE's valuable and recognizable trademark without a proper license, then third parties that might otherwise be interested in entering into such agreements may be discouraged from doing so, resulting in loss of revenue and market share for the WWE brand and diminishment of the brand in the eyes of consumers.  In *Murjani International, Ltd.* v. *Sun Apparel, Inc.*, the court granted a preliminary injunction where the defendants continued to use marks in association with a clothing line after their license to use the marks was terminated.  1987 WL 15110, at *12 (S.D.N.Y. July 31, 1987).  Similarly, in *Volpone Stamp Co.*, the court granted a preliminary injunction in favor of a famous baseball player who sought to bar the defendant from selling memorabilia featuring the baseball player's name, likeness, and facsimile signature following withdrawal of authorization and during the trademark infringement litigation.  107 F. Supp. 2d at 403–05.

Accordingly, WWE has demonstrated irreparable harm through numerous avenues and this Court should enjoin Panini from further use of WWE's intellectual property.  Given the strength of this factor and WWE's likelihood of success on the merits, the Court should grant WWE's motion for a preliminary injunction and temporary restraining order.  *See New York* v. *United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020) (plaintiff "may be able to show that a preliminary injunction is warranted on the strength of these first two factors alone," i.e., without considering the "balance of the equities" and the "public interest.").

## III.   The Balance of Hardships Weighs Strongly in WWE's Favor

If Panini is allowed to continue its unauthorized use of WWE's trademarks, WWE will suffer not only monetary loss but also damage to its reputation, loss of control of its reputation, and loss of industry and consumer trust and goodwill.  Zanghellini Decl. ¶ 29.  By contrast, if an

injunction is entered, Panini will at most suffer quantifiable money damages.  And any such harm Panini may suffer is entirely of its own doing because Panini deliberately continued to manufacture, sell, advertise, and distribute products that infringe on the WWE intellectual property and with the full knowledge that it was doing so.  "In assessing these factors, the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'"  *Make the Road New York* v. *Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citation omitted).  "[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  *Mint, Inc.* v. *Amad*, 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011).  The balance of hardships weighs in favor of the non-infringing party.  *See Vinci Brands LLC* v. *Coach Servs.*, 2023 WL 5950690, at *9 (finding balance of hardships weighed in favor of licensor which "face[d] harm to its own goodwill, reputation and ability to sell [products] bearing its brand without confusion . . . about who holds a valid license . . . and as to the source, sponsorship, affiliation or approval of [licensor's] goods"); *CJ Prods. LLC* v. *Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) ("Defendants are unable [to] assert an equitable interest in continuing a false advertising campaign.").

When the moving party will suffer harm that is not compensable in the absence of an injunction and the defendant is harmed only economically, courts in this circuit routinely find that the balance of hardships tips decidedly in the movant's favor.  *See Warner-Lambert Co.* v. *Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996); *see also Markovits* v. *Venture Info. Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (award of damages would not compensate moving party where threat of harm was to party's viability in marketplace).

### IV.     The Public Interest Supports an Injunction

Enjoining Panini serves the public interest by ensuring that the public is not deceived or confused.  In the context of the continuing use of a mark by an ex-licensee, the risk of consumer confusion is greater and enjoining Panini would serve the public interest.  *See Church of Scientology Int'l*, 794 F.2d at 44 ("[T]he public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion."); *Flawless Style LLC*, 2023 WL 3687782, at *6 (similar).  "The public has a protectable interest in being free from confusion, deception and mistake." *Vinci Brands LLC* v. *Coach Servs.*, 2023 WL 5950690, at *9 (citation and internal quotation marks omitted).

### V.      TRO Is Needed to Preserve the Status Quo Pending a Preliminary Injunction Hearing

The same factors for a preliminary injunction all support the granting of a temporary restraining order.  *See* Fed R. Civ. Pro. 65(b) (the court may issue a temporary restraining order if "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition").

### <u>CONCLUSION</u>

WWE respectfully requests that the Court grant its motion for a preliminary injunction and temporary restraining order.

Dated:  September 20, 2023
       New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By: _____
Daniel J. Kramer
Gregory F. Laufer
Emily A. Vance
1285 Avenue of the Americas
New York, New York 10019-6064
Phone:  (212) 373-3096
Fax:  (212) 492-0096
dkramer@paulweiss.com
glaufer@paulweiss.com
evance@paulweiss.com

*Attorneys for Plaintiff World Wrestling
Entertainment, LLC.*