UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, LLC, f/k/a WORLD WRESTLING ENTERTAINMENT, INC., | |
| Plaintiff, | Case No. 23-CV-8371 (LGS) |
| v. | |
| PANINI S.P.A., | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## WWE'S MOTION FOR A PRELIMINARY INJUNCTION

# **<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 6

I.       WWE ............................................................................................................................ 6

II.      WWE's Agreement with Panini ................................................................................. 7

III.     Panini's Efforts to Transfer the Agreement to Fanatics ....................................... 8

IV.     Panini's Decline and WWE's Termination of the Agreement ............................. 8

V.      Panini's Unlawful Post-Termination Conduct ..................................................... 10

VI.     Procedural History .................................................................................................... 11

ARGUMENT ..................................................................................................................... 11

I.       WWE Has Shown a Clear Likelihood of Success on the Merits ....................... 12

         A.     Panini Breached the Agreement .................................................................. 12
         B.     Panini Cannot Show WWE Waived Its Termination Rights ................... 12
         C.     Panini Has Breached and Is Continuing to Breach the Termination
                Provisions of the Agreement ....................................................................... 17
         D.     Panini's Conduct Infringes WWE's Trademarks ..................................... 18
         E.     Panini's Conduct Infringes WWE's Copyrights ...................................... 20

II.      WWE Will Suffer Irreparable Harm If Panini Is Not Immediately Restrained .............. 21

III.     The Balance of Hardships Weighs Strongly in WWE's Favor .......................... 23

IV.     The Public Interest Supports an Injunction ......................................................... 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Axginc Corp.* v. *Plaza Automall, Ltd.*,
    759 F. App'x 26 (2d Cir. 2018) .........................................................................................16, 17

*Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of New Jersey, Inc.*,
    448 F.3d 573 (2d Cir. 2006)...............................................................................................17

*Bigda* v. *Fischbach Corp.*,
    898 F. Supp. 1004 (S.D.N.Y. 1995).....................................................................................15

*Cadbury Beverages, Inc.* v. *Cott Corp.*,
    73 F.3d 474 (2d Cir. 1999)..................................................................................................19

*Can't Stop Prods., Inc.* v. *Sixuvus, Ltd.*,
    295 F. Supp. 3d 381 (S.D.N.Y. 2019)..................................................................................18

*Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)................................................................................................18

*Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986)............................................................................................ *passim*

*CJ Prods. LLC* v. *Snuggly Plushez LLC*,
    809 F. Supp. 2d 127 (E.D.N.Y. 2011) .................................................................................24

*Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*,
    216 F. Supp. 2d 31 (E.D.N.Y. 2001) ..................................................................................19

*Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)................................................................................................12

*Feist Publc'ns, Inc.* v. *Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)............................................................................................................20

*Flawless Style LLC* v. *Saadia Group LLC*,
    2023 WL 3687782 (S.D.N.Y. May 26, 2023) ...............................................................18, 24

*Friesland Brands, B.V.* v. *Vietnam Nat. Milk Co.*,
    228 F. Supp. 2d 399 (S.D.N.Y. 2002).................................................................................20

*Frontier Airlines, Inc.* v. *AMCK Aviation Holdings Ireland Limited*,
    2023 WL 4364450 (S.D.N.Y. July 6, 2023) .......................................................................13

*Gramercy Holdings I, LLC* v. *Matec S.R.L.*,
    2023 WL 5917624 (S.D.N.Y. Sept. 11, 2023).....................................................................14

*GTFM, Inc.* v. *Solid Clothing Inc.*,
   215 F. Supp. 2d 273 (S.D.N.Y. 2002) ..................................................................20

*Gund, Inc.* v. *Russ Berrie & Co.*,
   701 F. Supp. 1013 (S.D.N.Y. 1988) ....................................................................23

*Iancu* v. *Brunetti*,
   139 S. Ct. 2294 (2019) ........................................................................................18

*Jefpaul Garage Corp.* v. *Presbyt. Hosp. in City of N.Y.*,
   61 N.Y.2d 442 (N.Y. 1984) .................................................................................16

*Kendall* v. *Kendall*,
   44 A.D.3d 827 (N.Y. App. Div. 2007) .................................................................16

*Krevat* v. *Burgers to Go, Inc.*,
   2014 WL 4638844 (E.D.N.Y. Sept. 16, 2014) ....................................................20

*Krispy Kreme Doughnut Corp.* v. *Satellite Donuts, LLC*,
   725 F. Supp. 2d 389 (S.D.N.Y. 2010) ..................................................................17

*L & L Wings, Inc.* v. *Marco-Destin, Inc.*,
   676 F. Supp. 2d 179 (S.D.N.Y. 2009) ..................................................................19

*Lamborn* v. *Dittmer*,
   873 F.2d 522 (2d Cir. 1989) ................................................................................13

*Lane Capital Mgmt., Inc.* v. *Lane Capital Mgmt., Inc.*,
   192 F.3d 337 (2d Cir. 1999) ................................................................................18

*Lois Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986) ................................................................................19

*Luitpold Pharms., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   784 F.3d 78 (2d Cir. 2015) .............................................................................14, 15

*Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*,
   690 F. Supp. 2d 293 (S.D.N.Y. 2010) ..................................................................16

*MBIA Ins. Corp.* v. *Patriarch Partners VIII, LCC*,
   842 F. Supp. 2d 682 (S.D.N.Y. 2012) ..................................................................16

*Millennial Plastic Surgery PLLC* v. *James*,
   2021 WL 5988322 (S.D.N.Y. Dec. 16, 2021) .....................................................22

*Mint, Inc.* v. *Amad*,
   2011 WL 1792570 (S.D.N.Y. May 9, 2011) ........................................................24

*Morningside Grp., Ltd.* v. *Morningside Cap. Grp., L.L.C.*,
  182 F.3d 133 (2d Cir. 1999).............................................................................20

*MyPlayCity, Inc.* v. *Conduit Ltd.*,
  2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012) ........................................................19

*New York City Triathlon, LLC* v. *NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010), .................................................................23

*Omega Importing Corp.* v. *Petri-Kine Camera Co.*,
  451 F.2d 1190 (2d Cir. 1971)........................................................................22, 23

*Opticians Ass'n of Am.* v. *Independent Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)....................................................................6, 11, 23

*Optima Media Grp. Ltd.* v. *Bloomberg L.P.*,
  2021 WL 1941878 (S.D.N.Y. May 14, 2021) ......................................................16

*Parker Hannifin Corp.* v. *N. Sound Props.*,
  2013 WL 1932109 (S.D.N.Y. May 8, 2013) ........................................................16

*Polaroid Corp.* v. *Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961).............................................................................19

*Polymer Tech. Corp.* v. *Mimran*,
  975 F.2d 58 (2d Cir. 1992)..............................................................................20

*Power Test Petrol Distribs., Inc.* v. *Calcu Gas, Inc.*,
  754 F.2d 91 (2d Cir. 1985)..............................................................................22

*Prudential Ins. Co. of Am.* v. *Ikomoni*,
  1996 WL 640915 (S.D.N.Y. Nov. 6, 1996)...........................................................19

*Ryan* v. *Volpone Stamp Co.*,
  107 F. Supp. 2d 369 (S.D.N.Y. 2000)..........................................................6, 11, 19

*S.D. Hicks & Son Co.* v. *J.T. Baker Chemical Co.*,
  307 F.2d 750 (2d Cir. 1962)............................................................................13

*Schmal* v. *McCulla*,
  711 N.Y.S.2d 7 (N.Y. App. Div. 2000) ..............................................................15

*Stern's Miracle-Gro Prods., Inc.* v. *Shark Prods. Inc.*,
  823 F. Supp. 1077 (S.D.N.Y. 1993).....................................................................19

*Structured Cap. Sols., LLC* v. *Commerzbank AG*,
  177 F. Supp. 3d 816 (S.D.N.Y. 2016)....................................................................4

*Sunward Elecs., Inc.* v. *McDonald*,
    362 F.3d 17 (2d Cir. 2004) ...................................................................................17

*Ticor Title Ins. Co.* v. *Cohen*,
    173 F.3d 63 (2d Cir. 1999) ...................................................................................22

*Tri-Star Pictures, Inc.* v. *Unger*,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998) ....................................................................19

*Vinci Brands LLC* v. *Coach Servs.*,
    2023 WL 5950690 (S.D.N.Y. Sept. 13, 2023) ............................................. *passim*

*Virgin Enter. Ltd.* v. *Nawab*,
    335 F.3d 141 (2d Cir. 2003) .................................................................................19

*In re Wil-Low Cafeterias*,
    95 F.2d 306 (2d Cir. 1938) ...................................................................................16

*World Wide Polymers, Inc.* v. *Shinkong Synthetic Fibers Corp.*,
    2010 WL 3155176 (S.D.N.Y. July 30, 2010) .......................................................14

*Yang* v. *Kosinski*,
    960 F.3d 119 (2d Cir. 2020) .................................................................................11

*Yurman Design, Inc.* v. *PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) .................................................................................21

**Statutes**

15 U.S.C. § 1115 ..........................................................................................................18

17 U.S.C. § 410(c) .......................................................................................................21

Plaintiff World Wrestling Entertainment, LLC (f/k/a World Wrestling Entertainment, Inc.) ("WWE") respectfully submits this memorandum of law in support of its motion for a preliminary injunction prohibiting Defendant Panini S.p.A. ("Panini"), a former licensee WWE has terminated, from continuing to sell, advertise, and/or distribute WWE products and merchandise.

## PRELIMINARY STATEMENT

WWE is an integrated media and entertainment company that has been involved in sports entertainment for more than four decades.  It is one of the most popular brands in global entertainment, developing compelling and complex characters known as "Superstars" that it weaves into dynamic storylines and producing and distributing unique and creative content through, among other things, its flagship programs *Raw* and *SmackDown*, its premium over-the-top network, and its premiere live events such as *WrestleMania*.  Its programs are available worldwide in more than one billion homes and in 30 languages.  Based on the strength of WWE's brands and its ownership and control over its intellectual property, WWE has leveraged its content and talent globally across virtually all media platforms.

Intellectual property is critical to all aspects of WWE's operations, and WWE expends substantial cost and effort to maintain and protect its intellectual property.  WWE has a large portfolio of registered and unregistered trademarks and service marks worldwide and maintains a large catalog of copyrighted works.  WWE has established a worldwide licensing program involving more than 100 licensees, who use WWE's marks, logos, copyrighted works, and characters on a large variety of products, including video games, toys, apparel, trading cards and other collectibles.  It is of immense importance to WWE that it maintain the distinctive style and quality of its intellectual property and brand in the design, packaging, advertising, and promotional materials associated with its products.

1

Panini produces trading cards and other collectibles.  In 2021, Panini became one of WWE's many licensees when WWE executed a term sheet granting Panini a limited license to use WWE's intellectual property, which was subsequently memorialized in a long-form Consumer Product License Agreement (the "Agreement").  In 2022, Panini informed WWE that it would be entering a potential merger or sale with Fanatics SPV, LLC ("Fanatics"), another manufacturer of sports collectibles, and initiated the process of transferring its license to produce WWE's products to Fanatics.  However, the Panini/Fanatics deal fell apart in the spring of 2023 and, since then, Panini has been shedding key employees and losing key customers.  In April 2023, more than 35 of Panini's high-level employees abruptly resigned, including senior members of Panini America's trading card operations team, many of whom serviced WWE's account.  In August 2023, the National Football League Players Association ("NFLPA") announced it was cancelling its trading card deal with Panini.  And, in 2025, Panini will lose its right to produce cards for the National Basketball Association ("NBA").

These events caused WWE to become concerned about its relationship with Panini.  In July 2023, WWE accelerated a planned audit of Panni's performance under the Agreement.  And, following the NFLPA's decision in August 2023 to terminate Panini, senior WWE officers asked members of WWE's licensing team to take a hard look at WWE's relationship with Panini.  What WWE found is that Panini had failed in its contractual obligations relating to entire categories of products.  WWE's Agreement with Panini obligated Panini to (i) create prototypes of each of the expressly enumerated licensed products (the "Licensed Products") and submit them for WWE's approval and (ii) make the Licensed Products available for sale both in-store and online.  WWE discovered that Panini had completely failed to create prototypes, submit them for WWE's approval, or make available for sale, any items within the "Physical Trading

Card Games" or the "Digital Trading Cards" Licensed Product categories.

These failures entitled WWE to terminate the Agreement and WWE did so on August 25, 2023.  Upon termination, Panini was required to (i) immediately and permanently discontinue using WWE's intellectual property, (ii) immediately and permanently discontinue manufacturing, selling, advertising, distributing, and using the products WWE licensed to Panini, and (iii) deliver to WWE or destroy (at WWE's sole discretion) any remaining inventory of the products WWE licensed to Panini.  Panini, however, has refused to do any of these things. Instead, in violation of its obligations under the Agreement, Panini is infringing on WWE's intellectual property rights by continuing to sell, advertise, distribute, and use WWE intellectual property despite WWE's directive to cease and desist doing so.  Panini also has falsely continued to hold itself out as an official licensee of WWE products.

In the temporary restraining order ("TRO") proceedings, Panini made no attempt to argue that it had complied with its contractual obligations.  Instead, Panini sought to shift the blame for its non-performance to WWE, arguing that WWE waived its right to insist on full performance under the Agreement by not complaining earlier about Panini's failures.  That argument fails for numerous reasons.

*First*, Panini was required to perform under the Licensing Agreement whether WWE complained or not.  The Agreement did not contain any obligation that WWE notify Panini of its breaches and, unlike other provisions of the Agreement, Panini did not have any right to cure its failure to produce and sell digital trading cards or physical trading card games.  Instead, in the face of these breaches, the Agreement granted WWE the right, in its sole discretion, to terminate the Agreement immediately.  (ECF 1 ("Compl.") Ex. A §§ B(1) and L(1).)

*Second*, the Agreement speaks directly to the issue of waiver and contains a broad and

unequivocal non-waiver provision.  It states that "WWE's failure to . . . act upon any provision of this Agreement . . . will not constitute or be deemed a waiver of any of WWE's rights hereunder and such rights shall be exercisable when it is deemed appropriate by WWE."  (*Id.* § N(4).)  Indeed, even in contracts that do not have non-waiver provisions, New York law is clear that waiver must be voluntary and intentional and should not be inferred.  *See Structured Cap. Sols., LLC* v. *Commerzbank AG*, 177 F. Supp. 3d 816, 824-25 (S.D.N.Y. 2016).

*Third*, although Panini argued at the TRO hearing that WWE approved of its failures, Panini did not come forward with any evidence showing that WWE ever agreed to relieve Panini of its obligation to create and sell digital trading cards and physical trading card games.  Indeed, when pressed at the hearing, Panini's counsel admitted that "there was no discussion" of these failures by WWE and Panini, much less approval by WWE.  (Declaration of Emily Vance ("Vance Decl.") Ex. A ("TRO Hr'g Tr.") at 17:17.)  Moreover, the Agreement clearly provides that Panini needed WWE's explicit written approval to modify the Agreement to drop these obligations, requiring that modifications of the Agreement must be set out in writing and signed by the parties.  (Compl. Ex. A § N(3).)  Even Panini does not claim that any such writing exists.

*Fourth*, at the TRO hearing, Panini repeatedly referred to the fact that WWE employees complimented Panini's performance of some of its obligations under the Agreement and noted that WWE received millions of dollars of royalties for the products Panini actually sold.  (TRO Hr'g Tr. at 19:21-25.)  That, of course, is irrelevant.  Praise for Panini's performance of some aspects of the Agreement does not excuse full performance under the contract.  And WWE's receipt of payment due and owing for products Panini actually sold under the Agreement does not constitute an agreement to relieve Panini from its obligations to create and sell other products also required under the Agreement.

*Finally*, Panini's continued use of WWE's intellectual property, in violation of the Agreement, clearly constitutes irreparable harm to WWE.  This is so for several reasons:

*First*, there can be no doubt that WWE's intellectual property is extraordinarily important to WWE and Panini explicitly acknowledged in the Agreement that violations would cause irreparable harm to WWE.  Specifically, Panini conceded the obvious fact that "WWE Intellectual Property possesses a special, unique and extraordinary character that cannot be . . . adequately compensated for in money damages and that any breach by [Panini] of [the] Agreement will cause irreparable injury and harm to WWE."  (Compl. Ex. A § L(5).)

*Second*, in cases involving the unauthorized use of a company's intellectual property, there is statutory presumption of irreparable harm.  As this Court held just last month in the *Vinci* case, where, as here, a licensor in a trademark infringement case demonstrates a likelihood of success on the merits, irreparable harm is presumed.  *Vinci Brands LLC* v. *Coach Servs.*, 2023 WL 5950690, at *9 (S.D.N.Y. Sept. 13, 2023) (citing 15 U.S.C. § 1116(a)).  This Court explained that "[i]rreparable injury 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark' because a loss of reputation is not calculable nor precisely compensable."  *Id.*  (collecting cases).

In fact, the Second Circuit has gone so far as to hold that where, as here, a former licensee continues to sell licensor's products after termination, the finding of irreparable harm is "almost inevitably" satisfied.  *Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986).  The Court explained that "in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling in the ordinary case" and that it "inevitably" follows that "a finding of irreparable harm is automatic."  *Id.*

Notably, the Second Circuit did not require the plaintiffs in *Church of Scientology* to demonstrate actual harm to their reputation, finding that the mere loss of control over its reputation is what constituted the requisite irreparable harm.  *Id.* at 43-44.  As another court has explained, irreparable harm is inevitable in terminated licensee cases because the "Plaintiff's mark is his authentic seal . . . If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use."  *Ryan* v. *Volpone Stamp Co.*, 107 F. Supp. 2d 369, 404 (S.D.N.Y. 2000) (quoting *Opticians Ass'n of Am.* v. *Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)).

So too here.  Panini's continued unauthorized use of WWE's intellectual property constitutes irreparable harm because, by Panini going rogue, and selling WWE branded products without permission, WWE has lost control over its marks.  Under unequivocal Second Circuit law, irreparable harm in this context is "presumed," "inevitable," and "automatic."

For all of these reasons, and the others set forth below, Panini should be enjoined from continuing to sell, advertise, and/or distribute WWE products and merchandise.

## FACTUAL BACKGROUND

### I.     WWE

WWE is a global media and entertainment company.  Its unique product, for which it coined the term "sports entertainment," is best described as an action-adventure episodic drama that is akin to an ongoing, ever-developing soap opera based on WWE's distinctive and provocative characters.  (ECF 18 ("First Zanghellini Decl.") ¶ 3.)  In connection with these activities, WWE creates colorful characters – its Superstars – who generally appear under a trademarked name and are distinctively delineated with unique persona, history, storyline, relationships, music, visual appearance, and behavior.  (*Id.*)

WWE promotes hundreds of live shows each year in arenas and stadiums around the world.  WWE also produces weekly television programs on broadcast and cable television that are distributed around the world, monthly "pay-per-view"/special event programs and other original content available through a subscription to the WWE Network, which is an online subscription with Peacock, the streaming service from NBCUniversal.  (*Id.* ¶ 4.)

Since 1983, WWE and its predecessor entities have provided these wrestling and entertainment events and services under various service marks.  For the past two decades, those service marks have included WORLD WRESTLING ENTERTAINMENT®, WWE®, and the WWE logo.  (*Id.* ¶ 2.)  To further these activities, WWE engages in an extensive licensing program, where WWE's copyrighted characters, trademarks, service marks and other intellectual property rights are depicted on a wide variety of consumer products distributed by more than 100 licensees worldwide.  (*Id.* ¶ 5.)

## II.    WWE's Agreement with Panini

Panini, a distributor of trading cards and other collectibles, was one of WWE's licensees. In July 2021, WWE entered into a term sheet with Panini, which was superseded in March 2022 by the Agreement.  (Compl. Ex. A.)  Under the Agreement, WWE granted Panini a license to use certain WWE intellectual property approved by WWE in connection with the manufacture, distribution, and sale of physical trading cards, digital trading cards, physical trading card games, physical stickers, and physical collector albums.  (*Id.* §§ 1(f), 2(a)(i), Schedule A.)  In exchange, Panini agreed to pay WWE certain royalties, including recoupable yearly minimum guarantees and a percentage royalty for sales of the licensed products.  (*Id.* § 4.)  The Agreement was to run from January 1, 2022, through December 31, 2025, unless terminated earlier.  (*Id.* § 3.)[1]

---

[1]    WWE entered into a partnership with Fanatics providing that Fanatics' trading cards and collectibles division, The Topps Company, Inc., would become the exclusive provider of the

### III.    Panini's Efforts to Transfer the Agreement to Fanatics

In April 2022, Panini informed WWE that Panini was having conversations with Fanatics concerning a potential merger or sale.  (Second Zanghellini Decl. ¶ 11.)  Panini then sought to negotiate an amendment to the Agreement with WWE whereby the Agreement would terminate early and Panini could sell its remaining inventory to Fanatics.  (*Id.* ¶ 12.)  The contemplated termination date varied over time—from as early as end of September 2022 to as late as end of March 2023—seemingly as Panini's and Fanatics' plans shifted.  (*Id.*)  That merger or sale ultimately did not come to fruition.  (*Id.*)

### IV.    Panini's Decline and WWE's Termination of the Agreement

Following these events, Panini has lost anchor customers and shed key employees.   On April 4, 2023, news broke that Panini would not be making trading cards for the NBA during the 2023-24 NBA season despite Panini's then-existing agreement with the NBA and NBA Players Association to produce cards for the league through 2026.  (Vance Decl. Ex. B.)  The next day, several sports blogs reported that dozens of employees had abruptly left Panini (*id.* Ex. C), including members of Panini's trading card operations central to the WWE-Panini partnership who were directly responsible for the development of the WWE Licensed Products.  This included Alex Carbajal, the Acquisitions Manager for the WWE relationship, and Eliana Yellin, and Seth Garrison, members of Panini's Acquisitions Support Staff who were responsible for the WWE Licensed Product development team.  (Declaration of Steven Pantaleo ("Pantaleo Decl.") ¶ 6.)  The new employees Panini assigned to the WWE relationship were considerably less experienced than their predecessors.  (Second Zanghellini Decl. ¶ 16.)  Unlike Mr. Carbajal, who had worked in acquisition management for Panini for 13 years, Kurtis Hawn, the new

---

Licensed Products once Panini's rights expired.  (Supplemental Declaration of Scott Zanghellini ("Second Zanghellini Decl.") ¶ 11.)

Acquisitions Manager, had just one year of experience as an Assistant Acquisitions Manager and had just graduated from university in 2022.  (Vance Decl. Ex. D.)  In lawsuits relating to the employee departures, Panini has admitted that it lost 36 employees, has characterized Mr. Carbajal and seven other former employees lost as having been "high level and trusted," and has described the former employees as "key members in Panini's production and acquisition teams" who provided  "critical input for [Panini's] business operations."  (*Id.* Ex. E ¶¶ 1, 2(d), 34; *id.* Ex. F. ¶¶ 99, 101, 121.)

Unsurprisingly, WWE has been harmed by Panini's loss of critical personnel.  In the aftermath of the abrupt exodus of dozens of trusted and knowledgeable Panini employees, Panini ran behind in processing inventory, providing purchase orders, and responding to routine requests regarding WWE business.  (Pantaleo Decl. ¶ 8; Second Zanghellini Decl. ¶ 17.[2])  In turn, Panini's failures to continue what had been the ongoing business cadence between the parties resulted in late payments to WWE talent, adversely affecting core relationships at the heart of WWE's business.  (Pantaleo Decl. ¶ 8.[3])

In the wake of these concerns, WWE accelerated a scheduled audit of Panini's performance.  (Second Zanghellini Decl. ¶ 18.)  Panini pushed back on the timing of the audit and expressed refusal to provide entire categories of documents that are standard for licensees to provide in connection with an audit.  (*Id.* ¶¶ 18-19.)  While the audit is not yet complete, WWE's auditor has found several troubling issues, including that Panini appears to be holding so-called reserves through returns, which is improper under the Agreement.  (*Id.* ¶¶ 19-20.)

---

[2]  *See also* Vance Decl. Exs. G-I (noting, among other delays, a "major lag" in Panini processing autograph inventory).

[3]  *See also* Vance Dec. Exs. G, J (noting delayed payments to talent because of Panini's delays).

Panini's business predicaments continued through the summer, and on August 21, 2023, the NFL Players' Association announced it was cancelling its trading card deal with Panini. (Vance Decl. Ex. K.)  Senior WWE officers then asked WWE's licensing team to further evaluate Panini's performance.  (Second Zanghellini Decl. ¶ 20; Pantaleo Decl. ¶ 9.)  WWE found that Panini had failed in its obligations under the Agreement to produce and sell entire categories of products.  (*Id.*)  Specifically, the Agreement obligated Panini to (i) create prototypes of each item of the five product categories licensed to it and submit them for WWE's approval and (ii) make those products available for sale both in-store and online by June 1, 2022. (Compl. Ex. A § (1)(a), Schedule A.)  WWE discovered that Panini had failed to create prototypes and seek WWE's approval for, or make available for sale, any items within the "Physical Trading Card Games" or the "Digital Trading Cards" Licensed Product categories. (First Zanghellini Decl. ¶ 15; Pantaleo Decl. ¶ 9.)  Those failures entitled WWE to terminate the Agreement immediately.  The Agreement did not give Panini a right to advance notice of the termination or provide that Panini must be given an opportunity to cure the breaches.  (Compl. Ex. A §§ B(1)(a), L(l)(a)(ii).)  WWE sent Panini a notice of termination on August 25, 2023. (*Id.* § N(6); Compl. Ex. B; First Zanghellini Decl. ¶ 16.)

## V.    Panini's Unlawful Post-Termination Conduct

Upon termination, Panini was required to (i) immediately and permanently discontinue using WWE's intellectual property, (ii) immediately and permanently discontinue manufacturing, selling, advertising, distributing, and using WWE products, and (iii) deliver to WWE or destroy (at WWE's sole discretion) any remaining inventory of the products WWE licensed to Panini.  (Compl. Ex. A §§ L(2), L(3).)  Panini, however, has not done any of those things.  Instead, in violation of its obligations under the Agreement, Panini has infringed WWE's intellectual property rights by continuing to sell, advertise, distribute, and use products reflecting

WWE intellectual property, many of which continue to be identified on Panini's website.  (*See* Compl. Ex. E.)  Panini also has falsely continued to hold itself out as an official WWE licensee. (*See id.*)

## VI.    Procedural History

In September 2023, WWE sued Panini for breach of contract, trademark and copyright infringement, and related claims.  Panini sued for a declaration that the contract had not been breached.  WWE filed a motion for preliminary injunction and a TRO.  (ECF 11.)  The Court denied the TRO but ordered the parties to meet and confer on a preliminary injunction schedule, which the parties submitted.

## <u>ARGUMENT</u>

To prevail on a motion for a preliminary injunction, the movant must show: (1) irreparable harm, (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, (3) that the balance of hardships tips decidedly in the movant's favor, and (4) that the public interest would not be disserved by the issuance of the injunction.  *See Yang* v. *Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).  Where the movant seeks a mandatory injunction, it must show a "clear or substantial likelihood of success on the merits." *Vinci Brands LLC*, 2023 WL 5950690, at *4.  Courts routinely grant mandatory preliminary injunctions where a former licensee is infringing on the licensor's marks.  *See, e.g.*, *Church of Scientology Int'l*, 794 F.2d at 40, 45 (reversing denial of preliminary injunction against former licensee who continued using the movant's marks after licensor terminated the license, and instructing district court to enter the preliminary injunction); *Opticians Ass'n of Am.*, 920 F.2d at 190, 198 (same); *Vinci Brands LLC*, 2023 WL 5950690, at *13 (barring former licensee from using the licensor's intellectual property following termination of license agreement); *Volpone Stamp Co.*, 107 F. Supp. 2d at 405 (preliminary injunction

awarded to former baseball player when memorabilia company continued using his trademark after license expired).

## I.    WWE Has Shown a Clear Likelihood of Success on the Merits

### A.    Panini Breached the Agreement

To prevail on a claim for breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citations omitted).

Here, it is undisputed that the Agreement is a valid contract (Compl. Ex. A) or that WWE fulfilled its obligations under the Agreement, while Panini did not.  (First Zanghellini Decl. ¶¶ 20-22; Pantaleo Decl. ¶¶ 4, 9.)  Specifically, the Agreement obligated Panini to (i) create prototypes of each item of the Licensed Products and submit them for WWE's approval and (ii) make the Licensed Products available for sale both in-store and online by June 1, 2022.  (Compl. Ex. A § B(1)(a).)  Panini, however, neither created prototypes nor made products available for sale for any product within the "Physical Trading Card Games" or the "Digital Trading Cards" Licensed Product categories.  (First Zanghellini Decl. ¶¶ 15, 21; Pantaleo Decl. ¶ 9.)  In fact, Panini admitted during the TRO proceedings that it never even planned to produce those items. (*See* TRO Hr'g Tr. at 17:5-19.)  Accordingly, it is clear that Panini breached its obligations under the Agreement, thereby causing damage to WWE.  (First Zanghellini Decl. ¶¶ 15, 21.)

### B.    Panini Cannot Show WWE Waived Its Termination Rights

Panini seeks to excuse its conceded breaches by arguing that WWE waived its termination rights by not complaining about Panini's performance, accepting royalty payments for the products Panini did produce, and supposedly approving a "plan" that did not include "Physical Trading Card Games" or the "Digital Trading Cards."  Panini bears the burden of

proving waiver, *Frontier Airlines, Inc.* v. *AMCK Aviation Holdings Ireland Limited*, 2023 WL 4364450, at *8 (S.D.N.Y. July 6, 2023), which it cannot meet for a number of reasons:

*First*, Panini was obligated to perform under the Agreement whether WWE complained or not.  The Agreement did not impose on WWE an obligation to police Panini's compliance with its obligations under the contract, to notify Panini of its breaches, or to exercise its termination rights the moment a breach occurred.  And although the Agreement provided Panini the ability to cure certain breaches, it did not provide a cure provision regarding the obligation to produce and sell digital cards or games.  Instead, for breaches of those obligations, the Agreement granted WWE the right, in its sole discretion, to terminate the Agreement immediately.  (Compl. Ex. A §§ B(1), L(1).)

 Settled case law is clear that WWE did not waive its termination rights by giving Panini additional time to comply with the contract rather than terminating the contract the moment Panini was in breach.  As the Second Circuit held in *Lamborn* v. *Dittmer*, 873 F.2d 522, 529 (2d Cir. 1989), where a contract does not require a party to "act on his termination rights as soon as they were triggered," a waiver should not be implied by forbearance because "[c]ommon sense dictates that merely by sticking with the business" a party does not forfeit its termination rights. *See also S.D. Hicks & Son Co.* v. *J.T. Baker Chemical Co.*, 307 F.2d 750, 752 (2d Cir. 1962) ("there is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other parties to perform thereunder").

*Second*, although Panini argued at the TRO hearing that WWE approved of Panini's failures, Panini has not come forward with evidence showing WWE ever agreed to relieve Panini of its obligation to create and sell "Physical Trading Card Games" or "Digital Trading Cards."

Under New York law, a contractual right is waived only if it is "knowingly, voluntarily and intentionally abandoned." *Luitpold Pharms., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (citations omitted).  As such, there must be evidence of "undisputed acts or language so inconsistent with [the party's] purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." *Gramercy Holdings I, LLC* v. *Matec S.R.L.*, 2023 WL 5917624, at *44 (S.D.N.Y. Sept. 11, 2023).  "'[M]ere silence, oversight or thoughtlessness in failing to object' to a breach of the contract will not support a finding of waiver." *World Wide Polymers, Inc.* v. *Shinkong Synthetic Fibers Corp.*, 2010 WL 3155176, at *21 (S.D.N.Y. July, 30 2010).

Here, Panini has no evidence that comes close to satisfying these standards.  At the TRO hearing, Panini's counsel claimed for the first time, and without providing any evidence, that Panini had submitted "development plans" to get WWE's "buy in," that those plans "didn't have" the Licensed Products at issue, and that WWE had "signed off" on Panini's plans without objection, thereby waiving its ability to terminate the Agreement based on Panini's non-performance with respect to those Licensed Products.  (TRO Hr'g Tr. at 16:18-17:22.)  That is grossly inaccurate.  Although Panini did submit spreadsheets reflecting preliminary plans solely for selling physical trading cards for 2022 and 2023, there is no evidence that anyone understood that spreadsheets as identifying and limiting the full scope of Panini's work pursuant to the Agreement.  (Pantaleo Decl. ¶ 10; Vance Decl. Exs. L, M.)  In fact, Panini classified the 2022 spreadsheet as "preliminary" and never suggested that either reflected a comprehensive or exhaustive workplan.  (Pantaleo Decl. ¶¶ 10-11; Vance Decl. Exs. L, M.)  The spreadsheets clearly were not meant to be comprehensive plans, as they did not address other Licensed Product categories, including physical stickers and physical collector albums, that Panini did

manufacture and sell.  (Pantaleo Decl. ¶¶ 10-11; Vance Decl. Exs. L, M.)  It is thus unsurprising that, when pressed at the hearing, Panini's counsel admitted "there was no discussion" of Panini's decision not to produce digital trading cards or physical trading card games, much less approval by WWE.  (TRO Hr'g 17:15-17.)  That is fatal to Panini's argument, because "no discussion" is "mere silence," which is insufficient evidence to support the knowing and intentional relinquishment of rights necessary to support a claim of waiver.  *See Luitpold Pharms.*, 784 F.3d 78 at 95.

Moreover, the Agreement clearly sets out what Panini would need to do to modify the Agreement to relieve it of the obligation to produce digital trading cards and physical trading card games.  Modifications must be in a writing signed by the parties (Compl. Ex. A § N(3)), and Panini does not claim any such writing exists.  Courts routinely reject waiver arguments where such provisions exist and are not followed.  As the court held in *Bigda* v. *Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995):  "No waiver can have occurred here, however, because clause 11 of the employment agreement . . . states, 'No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Employee and an officer of Employer,' and defendant has not produced a written waiver."  *See also Schmal* v. *McCulla*, 711 N.Y.S.2d 7, 9 (N.Y. App. Div. 2000) ("Under ¶ 12 of the agreement . . . waiver of any provision may only be accomplished in a writing signed by the party to be charged, a condition not present.").

*Third*, the Agreement speaks directly to the issue of waiver and contains a broad and unequivocal non-waiver provision in favor of WWE.  It states:  "WWE's failure to perform or act upon any provision of this Agreement . . . will not constitute or be deemed a waiver of any of WWE's rights hereunder and such rights shall be exercisable when it is deemed appropriate by

WWE."  *Id.* § N(4).  "New York courts 'uniformly enforce' these types of clauses."  *Optima Media Grp. Ltd.* v. *Bloomberg L.P.*, 2021 WL 1941878, at *14 (S.D.N.Y. May 14, 2021). Indeed, the Second Circuit has held that, where a no-waiver clause exists, waiver "may not be inferred to frustrate the reasonable expectations of the parties embodied in a[n agreement] when they have expressly agreed otherwise."  *Axginc Corp.* v. *Plaza Automall, Ltd.*, 759 F. App'x 26, 28-29 (2d Cir. 2018).  And "[b]ecause the words of a contract are always the most important evidence of the parties' intentions, a no-waiver clause is highly probative of an intent not to waive."  *Optima Media Grp.*, 2021 WL 1941878, at *14.[4]

    *Finally*, at the TRO hearing, Panini repeatedly referred to the fact that some WWE employees complimented some of Panini's work and that WWE received millions of dollars of royalties for the products Panini actually sold.  (Hr'g Tr. at 16:7-9, 19:21-25; ECF 14 at 6.) That is irrelevant.  The fact some WWE employees were satisfied with some aspects of Panini's performance does not relieve Panini from its obligation to perform other services required by the Agreement.  Similarly, WWE's receipt of payments due for products Panini sold under the Licensing Agreement does not constitute an agreement to relieve Panini of its obligations to create and sell other products required by the Agreement.  None of this shows an unequivocal intent to waive contractual obligations, which is what Panini must show to establish waiver

---

[4]    *See Parker Hannifin Corp.* v. *N. Sound Props.*, 2013 WL 1932109, at *7-8 (S.D.N.Y. May 8, 2013); *Jefpaul Garage Corp.* v. *Presbt. Hosp. in City of N.Y.*, 61 N.Y.2d 442, 446-47 (N.Y. 1984); *MBIA Ins. Corp.* v. *Patriarch Partners VIII, LCC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) (declining to find an implied waiver where the contract at issue contained a non-waiver clause); *Maxim Grp. LLC* v. *Life Partners Holdings, Inc*., 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (same); *In re Wil-Low Cafeterias*, 95 F.2d 306, 309 (2d Cir. 1938); *Kendall* v. *Kendall*, 44 A.D.3d 827, 829 (N.Y. App. Div. 2007) (holding that plaintiff did not waive strict compliance with the contract because "the agreement included a 'no waiver' clause and required a written stipulation to alter the terms of the agreement," and plaintiff never signed such a waiver).

under Second Circuit precedent.  *See Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d, 573, 586 (2d Cir. 2006) (defendant's acceptance of eight years of payments below contract rate did not amount to an "express waiver of the [defendant's] rights to greater recompense"); *Axginc Corp.*, 759 F. App'x at 28 (similar).

### C.  Panini Has Breached and Is Continuing to Breach the Termination Provisions of the Agreement

WWE's lawful termination of the Agreement triggered additional contractual obligations on the part of Panini.  Specifically, Panini was required to immediately cease manufacturing, selling, advertising, distributing, and using WWE Licensed Products and to deliver to WWE any remaining inventory of Licensed Products.  Panini also was required to "immediately and permanently . . . discontinue using the WWE Intellectual Property."  (*Id.* §§ L(2), (3).)

Panini, however, has violated these contractual obligations by continuing to sell, advertise, and distribute WWE's Licensed Products and use WWE's intellectual property on its website.  (First Zanghellini Decl. ¶¶ 19-20, 22-25; Compl. Ex. E.) Panini has also continued to falsely represent on its website that it is "officially licensed" by WWE:



WWE thus has shown a clear likelihood of success on the merits of its claim that Panini breached its obligations under the Agreement's termination provisions.[5]

---

[5]      Further, "when a licensor terminates a trademark licensing '[a]greement[ ] in accordance with [its] terms,' the continued use of the mark is 'unlicensed and unlawful under the Lanham Act.'"  *Krispy Kreme Doughnut Corp.* v. *Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 393 (S.D.N.Y. 2010) (enjoining franchisee's use of franchisor's mark); *see also Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("The continued use by the defendants of a licensed

D.      **Panini's Conduct Infringes WWE's Trademarks**

Panini's contractual violations also infringe WWE's intellectual property rights.  To

succeed on a Lanham Act trademark infringement claim, a plaintiff must show that (1) the

trademark is valid and entitled to protection and (2) the defendant's use of the trademark is likely

to cause consumer confusion as to the origin, affiliation or association, or endorsement of

defendant's goods or services.  *See Christian Louboutin S.A.* v. *Yves Saint Laurent Am.*

*Holdings, Inc.*, 696 F.3d 206, 216-17 & n.9 (2d Cir. 2012).  WWE has made this showing.

1.      **WWE's Trademarks Are Valid**

WWE's trademarks, which WWE and its predecessor entities have used continuously

since 2002, are presumed to be distinctive, and its numerous incontestable trademark

registrations constitute conclusive proof that the marks are entitled to legal protection, as federal

registration constitutes prima facie evidence of a mark's validity and ownership.  15 U.S.C.

§ 1115(a); *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2297 (2019); *Lane Capital Mgmt., Inc.* v. *Lane*

*Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).  Incontestable trademark registrations

serve as "conclusive evidence" of valid trademarks.  15 U.S.C. § 1115(b).  Further, by entering

into the Agreement, Panini explicitly affirmed WWE's ownership of the marks and associated

goodwill.  (Compl. Ex. A § E(1); *Can't Stop Prods., Inc.* v. *Sixuvus, Ltd.*, 295 F. Supp. 3d 381,

391 (S.D.N.Y. 2019) ("By entering into the agreement, the licensee affirms the licensor's

ownership of the mark.").)

2.      **Panini's Use of WWE's Trademarks Is Presumed to Cause Confusion**

As the Second Circuit has held, where, as here, a former licensee is continuing to use the

---

trademark after the Franchise Agreement had been terminated constitutes . . . trademark
infringement."); *Flawless Style LLC* v. *Saadia Group LLC*, 2023 WL 3687782, at *2 (S.D.N.Y.
May 26, 2023).

licensor's actual trademarks, likelihood of confusion is presumed and "actual confusion need not be shown to prevail under the Lanham Act." *Lois Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also L & L Wings, Inc.* v. *Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law.").[6]  And, because likelihood of confusion exists as a matter of law, it is not necessary to analyze the likelihood of confusion factors set forth in *Polaroid Corp.* v. *Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  But even if the Court were to look at the *Polaroid* factors, those factors also strongly support a finding of likelihood of confusion here.

- ***WWE's trademarks are indisputably strong.***  WWE's trademarks have acquired strong secondary meaning in the marketplace as a result of the tremendous success and widespread and unsolicited press and media coverage that WWE products and services have enjoyed, (First Zanghellini Decl. ¶ 7; *Stern's Miracle-Gro Prods., Inc.* v. *Shark Prods. Inc.*, 823 F. Supp. 1077, 1085 (S.D.N.Y. 1993)), and as further evidenced by Panini's deliberate copying of the marks, *Tri-Star Pictures, Inc.* v. *Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998).

- ***Panini is using the exact same trademarks WWE uses.***  Panini is continuing to manufacture, sell, and/or advertise the same trading cards and stickers bearing WWE's intellectual property.  (First Zanghellini Decl. ¶¶ 22-26; *see Cadbury Beverages, Inc.* v. *Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1999) (identical marks are "similar" as a matter of law).)

- ***The products are sold in the same market.***  Panini's trading cards and stickers compete in the same market in which WWE's products are sold and target the same consumers.  (First Zanghellini Decl. ¶ 26; *see Virgin Enter. Ltd.* v. *Nawah*, 335 F.3d 141, 150 (2d Cir. 2003) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common

---

[6]      *See also Volpone Stamp Co.*, 107 F. Supp. 2d at 399 ("In the licensing framework, where the alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established."); *MyPlayCity, Inc.* v. *Conduit Ltd.*, 2012 WL 1107648, at *21 (S.D.N.Y. Mar. 30, 2012) ("[B]ecause [former licensee] continued to distribute [licensor]'s trademark after its license to do so was terminated, consumers could fairly conclude that Conduit still had [licensor]'s permission to use the mark, and likelihood of confusion is thus established as a matter of law."); *Prudential Ins. Co. of Am.* v. *Ikomoni*, 1996 WL 640915, at *1 (S.D.N.Y. Nov. 6, 1996) ("The continued use of the name and marks of [licensor] by [former licensee] will undoubtedly cause confusion to a public who will assume that [former licensee] continues to operate under the sponsorship of [licensor].").

source.").)  And where, as here, a former licensee uses the same trademark in the same market, "likelihood of confusion is inevitable." *Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 40 (E.D.N.Y. 2001) (further noting that "[s]uch cases are open and shut").

- ***Panini acted in bad faith.***  Panini's copying here is deliberate, thus showing bad faith.  Upon terminating the Agreement, WWE reminded Panini of its contractual obligations under the termination provisions (Compl. Ex. B.) and a few days later, after observing that Panini continued to advertise products using WWE's intellectual property, WWE sent Panini a cease-and-desist letter in which it again reminded Panini of its contractual obligations under the Agreement and demanded compliance.  (Compl. Ex. F.)  Panini, however, continued to use WWE's intellectual property to sell the same products to the same consumers.  (*See, e.g.*, Compl. Ex. E.)  It is evident that Panini intended the public to identify its products with those of WWE, as Panini's website continues to represent (falsely) that Panini is officially licensed by WWE.  *See GTFM, Inc.* v. *Solid Clothing Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (where similarities "are so strong that they could only have occurred through deliberate copying[,] . . . a presumption arises that the copier has succeeded in causing confusion").

- ***WWE should not be held hostage to Panini's lack of quality control.***  It is well settled that a trademark holder is entitled to maintain "the control of quality."  *Polymer Tech. Corp.* v. *Mimran*, 975 F.2d 58, 62 (2d Cir. 1992).  Here, because Panini has gone rogue, WWE has no control over the quality of Panini's infringing products. (First Zanghellini Decl. ¶¶ 28-29.) This factor further supports a finding of likelihood of confusion.  Moreover, even if Panini's infringing products were of similar quality to authorized WWE goods, that similarity would only further reinforce the likelihood of confusion here.  *See Morningside Grp., Ltd.* v. *Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999) ("Products of equal quality may tend to create confusion as to source because of that very similarity of quality.").

- ***Consumers are likely to exercise a low degree of care.***  The products at issue in this case are inexpensive.  The trading cards bearing WWE intellectual property that Panini continues to market are typically listed as costing $29.99 or $49.99, while stickers bearing WWE intellectual property cost just $0.40.  (*See* Compl. Ex. E.)  As such, consumers are less likely to exercise great care and more likely to be confused about the source of Panini's infringing products.  *See Friesland Brands, B.*V. v. *Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 411 (S.D.N.Y. 2002) (purchasers of relatively inexpensive goods are held to "lesser standard of purchasing care"); *Krevat* v. *Burgers to Go, Inc.*, 2014 WL 4638844, *10 (E.D.N.Y. Sept. 16, 2014) ("Buyer sophistication is generally low where inexpensive products are involved." (quotation marks omitted)).

## E.     Panini's Conduct Infringes WWE's Copyrights

To succeed on a copyright infringement claim, plaintiff must demonstrate (1) ownership

in a valid copyright and (2) infringement of the copyright by defendant.  *See Feist Publc'ns, Inc.*

v. *Rural Tel. Ser*v. *Co.*, 499 U.S. 340, 361 (1991).  WWE easily satisfies both elements.

### 1.     WWE's Copyrights Are Valid

The Copyright Act provides that a "certificate of a [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright."  17 U.S.C. § 410(c).  The copyrighted works at issue here include photographs of WWE footage, such as WWE's televised broadcasts of wrestling matches.  (First Zanghellini Decl. ¶ 24.)  WWE obtained certificates of copyright registration for those works within five years of first publication and are thus entitled to the statutory presumption of validity. (*Id.*)  Further, Panini has affirmed WWE's ownership of WWE's copyrights in the Agreement. (Compl. Ex. A § F(5).)

### 2.     Panini's Use of the Copyrights Is Unauthorized and Unlawful

To establish infringement, the copyright owner must show that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's."  *Yurman Design, Inc.* v. *PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001) (emphasis omitted) (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).  Here, Panini's infringement is plain.  After WWE terminated Panini's license to use WWE's copyrights, Panini continued to use the very same copyrighted works without WWE's authorization.  Thus, WWE is likely to succeed on the merits of its copyright infringement claims.

## II.     WWE Will Suffer Irreparable Harm If Panini Is Not Immediately Restrained

There can be no doubt that WWE's intellectual property is extraordinarily important to its business.  So much so, that Panini expressly acknowledged in the Agreement that "any breach" by Panini "will cause irreparable injury and harm to the WWE" in light of the "special, unique and extraordinary character" of WWE's intellectual property.  (Compl. Ex. A § L(5).)  Courts routinely enforce such contractual provisions in finding that a movant is likely to suffer

irreparable harm absent preliminary injunctive relief.  *See, e.g.*, *Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (finding irreparable harm and noting that irreparable harm provision in contract "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm"); *Millennial Plastic Surgery PLLC* v. *James*, 2021 WL 5988322, at *2 (S.D.N.Y. Dec. 16, 2021) (citing irreparable harm provisions as basis for finding movant demonstrated irreparable harm).

There is also a statutory presumption of irreparable harm.  As this Court noted in the *Vinci* case, where, as here, a terminated licensee continues to sell the licensor's product, the harm to the licensor's reputation is clear and irreparable harm is presumed.  *Vinci Brands LLC*, 2023 WL 5950690, at *9-10 (citing 15 U.S.C. § 1116(a)).

All of this follows binding and long-standing Second Circuit law.  As the Second Circuit explained in *Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*, where it reversed the denial of an injunction, "in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case," finding that the harm to the licensor by the loss of control over its reputation is so manifest that "a finding of irreparable harm is automatic."  794 F.2d at 42.  Similarly, the Second Circuit succinctly explained in *Omega Importing Corp.* v. *Petri-Kine Camera Co.*, that where a likelihood of success on the merits is shown in a trademark case, "irreparable injury . . . almost inevitably follows."  451 F.2d 1190, 1195 (2d Cir. 1971).  And in *Power Test Petrol Distribs., Inc.* v. *Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985), the Second Circuit held that irreparable harm exists in a trademark case "when the party seeking the injunction shows that it will 'lose control over the reputation of its trademark pending trial,' because reputation is 'not calculable nor precisely compensable.'"

Notably, the Second Circuit in *Church of Scientology*, *Omega Importing* and *Power Test Petrol* did not require a showing of actual harm to the licensor, finding that the licensor's mere loss of control over its reputation suffices to establish irreparable harm.  *Id*. at 43–44.  As the Third Circuit explained in *Opticians Ass'n of Am.* v. *Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990), actual harm need not be shown in terminated licensee cases because the "Plaintiff's mark is his authentic seal . . . If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use."  *See also New York City Triathlon, LLC* v. *NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard.").

Here, because Panini is no longer WWE's licensee, WWE has lost oversight and control over Panini's activities, and has no ability to police its trademarks and reputation.  (First Zanghellini Decl. ¶¶ 28-30.)  Panini's unauthorized use of WWE's intellectual property also damages WWE's relationships and potential relationships with its other licensees and business partners and dilutes the brand.  (*Id*.)  It makes it extremely difficult to grant use of its mark to potential licensees, and damages the value of the licenses offered.  (*Id.* ¶ 30.)  As a matter of law, that constitutes irreparable harm.

Finally, it bears noting that Panini has the ultimate burden of rebutting the very strong presumption of irreparable harm that attaches in this case.  *See Gund, Inc.* v. *Russ Berrie & Co.*, 701 F. Supp. 1013, 1025 (S.D.N.Y. 1988).  Based on all of the above, it will not be able to meet its burden.

## III.   The Balance of Hardships Weighs Strongly in WWE's Favor

Courts routinely hold that the balance of hardships weighs in favor of the non-infringing

party and thus in favor of injunctive relief. *See Vinci Brands LLC*, 2023 WL 5950690, at *9 (finding balance of hardships weighed in favor of licensor which "face[d] harm to its own goodwill, reputation and ability to sell [products] bearing its brand without confusion . . . about who holds a valid license . . . and as to the source, sponsorship, affiliation or approval of [licensor's] goods"); *CJ Prods. LLC* v. *Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) ("Defendants are unable [to] assert an equitable interest in continuing a false advertising campaign."). That is because "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Mint, Inc.* v. *Amad*, 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011).

If Panini is allowed to continue its unauthorized use of WWE's trademarks, WWE will suffer not only monetary loss but also damage to its reputation, loss of control of its reputation, and loss of industry and consumer trust and goodwill. (First Zanghellini Decl. ¶ 29.) By contrast, if an injunction is entered, Panini will at most (if at all) suffer quantifiable money damages. And any such harm Panini may suffer is entirely of its own doing because Panini deliberately continued to manufacture, sell, advertise, and distribute products that infringe on the WWE intellectual property and with the full knowledge that it was doing so.

## IV.    The Public Interest Supports an Injunction

As this Court has found, "[t]he public has a protectable interest in being free from confusion, deception and mistake." *Vinci Brands LLC*, 2023 WL 5950690, at *9. That holding applies here: in the context of the continuing use of a mark by an ex-licensee, the risk of consumer confusion is greater and enjoining Panini would serve the public interest. *See Church of Scientology Int'l*, 794 F.2d at 44 ("[T]he public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion."); *Flawless Style LLC*, 2023 WL 3687782, at *6 (similar).

## <u>CONCLUSION</u>

WWE respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: October 12, 2023

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Gregory F. Laufer*
Daniel J. Kramer
Gregory F. Laufer
Samantha A. Weinberg
Emily A. Vance
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
glaufer@paulweiss.com
sweinberg@paulweiss.com
evance@paulweiss.com

*Attorneys for Plaintiff World Wrestling Entertainment, LLC*