# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

WORLD WRESTLING ENTERTAINMENT, LLC,

Plaintiff,

v.

PANINI S.P.A.,

Defendant.

------------------------------x

23 Civ. 8371 (LGS)
23 Civ. 8324 (LGS)

Conference

New York, N.Y.
September 25, 2023
11:00 a.m.

Before:

HON. LORNA G. SCHOFIELD,

District Judge

APPEARANCES

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Plaintiff
BY: GREGORY FREDERICK LAUFER
EMILY A. VANCE

BOIES, SCHILLER FLEXNER LLP
Attorneys for Defendant
BY: ERIC BRENNER

quo, which means they have an extremely high burden, which is clear and substantial likelihood of success on the merits. I think one of the ways this case is very different than Vinci and many other cases is the course of conduct evidence.

They say we're supposed to do something on or by June 1st, they say we didn't do it, and they didn't say anything about it until August 25th. In fact, the evidence shows they praised us and said we're best in class in the interim. I think that speaks both to probability of success on the merits and why they can't show that and I think it speaks to irreparable harm. Whether they can show, as they must, because it's a mandatory injunction, a clear and substantial likelihood of success on the merits, the important thing to understand in thinking about this issue and why this course of conduct matters is that the contractual structure here is that the scope of the product line is developed collaboratively, with their buy in every step of the way.

At the beginning of each contract year -- and contract year is defined as 2022, defined as 2023 and so on -- we need to go to them, give them our development plans and get their buy in. That is Section 7(a) of the agreement. Before we bring any product, specific product to market, we need to go to them with the specifics of what we are doing and make sure they are signed off, that's A(2)(b) in the standard terms and conditions. And then once we are actually selling things, we

need to tell them exactly what's on the market, what we have sold for the quarter, what the net sales are, what the gross sales are.

THE COURT: So of all that, what actually happened?

MR. BRENNER: What actually happened, as Mr. Kazmierczak tells us in the declaration, at the beginning of 2022, we went to them with our plan, with our product release calendars. It didn't have the things they say it was supposed to have, there was no objection. We had weekly calls, submissions of approvals, tell them what products, we give them quarterly updates on performance of the products, the sales figures and unit shipping numbers. Complete transparency every step of the way. It is no mystery what we are doing; there's no mystery what we're not doing.

THE COURT: What about the games and digital playing cards, has there been any discussion about that?

MR. BRENNER: There was no discussion, because it was not in our plans that they signed off -- again, we go to them, we have to go to them at the beginning of the year. Again, if you look at Section 7(a) of the agreement, we have the obligation to tell them. This is collaborative. We don't get to decide anything unilaterally.

On the waiver point, in their brief, all they said was, these are uniformly enforced and they cite the Optima case. But if you look at what it says in the Optima case, it

what's happening?

MR. BRENNER: I don't know all the specifics, your Honor, so I don't want to speak in detail. Certainly, their position is the contract is terminated; our position is that the contract isn't validly terminated. So I think we're at a bit of loggerheads.

THE COURT: Right.

MR. BRENNER: Again, to be clear, they have this line in their brief, they are hostage to Panini's lack of quality control. That's just not our position at all, right. Our position is the contract remains in force. We have a parallel case we brought where we say that.

THE COURT: I understand.

MR. BRENNER: So we respect all of the quality control provisions, all of the approval provisions. We're not going to go rogue. There's no possibility of that.

THE COURT: As I understand it, there hasn't been any suggestion that there is something lacking in the quality of the product, other than the fact that you are just not authorized to do it, in their view.

MR. BRENNER: Correct. They routinely complimented us, as the declaration says in paragraph 17, they describe us as best in class, they told us we tripled their business compared to the prior licensee. So everything is opposite, they praise us for the work we're doing.